FRANK E. COE, GUARDIAN, APPELLEE, v. NATIONAL COUNCIL OF THE KNIGHTS AND LADIES OF SECURITY, APPELLANT.

FILED MAY 4, 1914. No. 17,735.

1. **Death: PRESUMPTION: EVIDENCE.** "The death of an absent person may be presumed in less than seven years from the date of the last intelligence from him, from facts and circumstances other than those showing his exposure to danger which probably resulted in his death." *Cox v. Ellsworth,* 18 Neb. 664.

2. ———: ———: ———. "Evidence of character, habits, domestic relations, and the like, making the abandonment of home and family improbable, and showing a want of all those motives which can be supposed to influence men to such acts, may be sufficient to raise the presumption of death, or from which the death of one absent and unheard from may be inferred without regard to the duration of such absence." *Cox v. Ellsworth,* 18 Neb. 664.

APPEAL from the district court for Otoe county: HARVEY D. TRAVIS, JUDGE. *Affirmed.*

*John C. Watson,* for appellant.

*Paul Jessen, contra.*

LETTON, J.

This is an action to recover upon an insurance certificate. Plaintiff recovered, and defendant appeals.

Harry F. Ganson, on September 8, 1910, was a dentist, residing in Nebraska City, about 44 years of age. He had been married twice. The family consisted of his sec-

ond wife with their three children, the oldest being 8 and the youngest 4 years of age. The ward of plaintiff, who is a daughter by the first wife, also lived in the family. Dr. Ganson had lived in Nebraska City for about 8 or 9 years. At the time of coming there he had but little of this world's goods, but was successful in his business, and by September, 1910, he had fully paid for his office building and fixtures, had purchased and furnished a home, a mortgage upon which was held by a building and loan association and was partly paid. He also had purchased and paid for three or four city lots. His income was from $1,800 to $2,000 a year from his business. He carried $5,000 fraternal life insurance, $3,000 of which was in favor of his daughter Josephine. Eight days before his disappearance he allowed a $2,500 accident insurance policy to lapse. Some bills he was sending out were found on his desk, and some dental supplies he had ordered on the 17th came in on the 19th. He was a man of domestic tastes and spent most of his spare time with his family. His wife testifies that because his business kept him closely engaged he purchased a bicycle, and it was his custom to take a ride each morning, leaving before the family were up and returning for breakfast. He was fond of fishing and swimming, and was a kind and indulgent husband and father. The family spent part of the summer of 1910 in Ohio, the doctor joining them, staying about two weeks, and coming home with them about the beginning of August. He was a member of the official board of the Methodist church, a member of the choir, and had no bad habits of any kind. He was fond of the open air, and while the family were in Ohio he pitched a tent in Riverside Park, near the Missouri River, and slept there during their absence, and on their return moved the tent to his back yard and slept there with his little boy. On Saturday, September 17, the family with some friends went to Riverside Park for a moonlight picnic. They returned home a little after 9 o'clock. The family soon retired, leaving Dr. Ganson sitting reading. About half past 2 in the morning Mrs. Ganson was awakened by the little boy crying, and

found the doctor was not in the tent with him. She testifies he had drunk two cupfuls of coffee at the picnic, and he could not sleep when he drank coffee. His nightgown was hanging on the side of the bed where he had hung it. All of his clothing, except a pair of khaki trousers, a shirt and a pair of bicycle shoes, were in the places where they were usually kept. About 6 in the morning the doctor's bicycle was found at Riverside Park on the crest of the bluff overlooking the river. A stick was stuck in the mud on the bank of the river and the clothing taken by him was hanging upon this stick. His bicycle shoes and his socks were on the ground beside it. Tracks of a barefooted man led from this point to the water's edge, and there were other tracks coming from the water and leading to a drift or log that was lying partly in the water, and which had been used by boys to jump into the river. The bank of the river was muddy, but there were no footprints leading back to the solid ground. The sheriff, who reached the scene about 7 o'clock in the morning, with others went up and down the river bank for a distance of between a half mile and a mile to see if they could find any fresh tracks leading out of the river, but were unable to find any. In the afternoon the river, which was from 6 to 9 feet deep at that point, was dragged, and afterwards on Sunday and Monday dynamite was used in the attempt to raise the body. Search was also made for footprints for about a mile on the other side of the stream, but none were found, though the character of the bank was such that an imprint would have been left if a man had walked over it. The following Tuesday some men who were working at a brick-yard at a point about a mile below testify they saw an object which they believed to be a naked body coming down the river. When asked as to the color of the object, a witness answered: "Why, he was white and shiny— you could see hair, you know; it looked like a man's or woman's body." This object was out about 150 yards. Some of the men went after a boat, but before they got it launched and reached the spot the object had disappeared. Another witness watched the body while the men went for

the boat.   He says it was rolling along on the edge of a sand-bar, and sank before the boat reached the spot.

Notices were printed and distributed along the river and elsewhere.   Mrs. Ganson wrote to many of his relatives and old school friends, and caused many inquiries to be made, but neither she nor any one else ever received any communication from him or from any other persons who saw him afterwards.

No evidence was introduced by the defendant.   This action was begun about a year after the disappearance.   The principle governing this case is well expressed, as follows, by Judge Sanborn in a case from this state, citing *Cox v. Ellsworth,* 18 Neb. 664, and other cases: "The established presumption of fact from the disappearance of an individual under ordinary circumstances, from whom his relatives and acquaintances have never afterwards heard, is that he continues to live for seven years after his disappearance.   If this presumption was unaffected by countervailing facts, it would continue in the case at bar until August 22, 1899; but this presumption of fact is not conclusive. It may be overcome, not only when the testimony of those who saw the insured die or saw his body after his death is produced, or when he was last seen in a peril that might probably cause his death, but also, when all the facts and circumstances of the case—the possible motives, if any, of the lost one to absent and conceal himself in view of approaching failure, disgrace, or punishment, his possible motives, if any, for returning to his family and occupation, his attachments to the members of his family and his friends, his interest and prospects in his business or occupation, and the extent of the unavailing search that has been made for him—are such that they would take the case out of the category of an ordinary disappearance, and would lead the unprejudiced minds of reasonable men, exercising their best judgment, guided by the established rule that life is presumed to continue seven years after an unexplained disappearance, to the conviction that death had intervened at an earlier date." *Northwestern Mutual Life Ins. Co. v. Stevens,* 71 Fed. 258.   See, also, *Winter v.*

*Supreme Lodge, K. of P.,* 96 Mo. App. 1, 101 Mo. App. 550.

While there is a possibility that Dr. Ganson may still be alive, we are of the opinion that a consideration of his whole history, his tastes, his habits, his occupation and his manner of life, when taken in connection with the facts that all the clothing which he is known to have been possessed of has been accounted for, that it was not shown that he was in possession of any money at the time of his disappearance, that his last known appearance in life was when he stood unclad upon the bank of the treacherous Missouri river, that what was believed by several witnesses to be the naked body of a human being a few days afterwards was seen in the river at a point below, was sufficient to justify the district court in finding that he died as alleged in the petition. We have been cited in defendant's brief to numerous instances of the disappearance of persons who were afterward found to be alive, but in none that have been called to our attention are the circumstances similar to those in this case.

The judgment of the district court was warranted by the evidence, and it is therefore

AFFIRMED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.