ELROY S. MUNSON, ADMINISTRATOR, APPELLEE, V. NEW
ENGLAND MUTUAL LIFE INSURANCE COMPANY,
APPELLANT.

FILED APRIL 20, 1934. No. 28921.

*William Baird & Sons*, for appellant.

*Craft, Edgerton & Fraizer, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and
PAINE, JJ., and MESSMORE, District Judge.

PAINE, J.

This is an action at law upon an old line life insurance
policy of $3,000 for the death of the insured, brought

after seven years had elapsed from the time he was last seen.

The evidence shows that Albert Russel Munson, usually called Russel Munson, was born at Aurora, Nebraska, October 23, 1891, and that at Lincoln, Nebraska, he took out a policy of insurance in the defendant company upon October 14, 1919, in the sum of $3,000, being an ordinary life policy, with a premium of $75.60 a year, the policy having double indemnity for accidental death and also total permanent disability clauses, which features are not involved in this action. This young man was unmarried, and, so far as the evidence discloses, he had no attachment for any young lady. He was a member of the Masonic lodge and also of the International Typographical Union. He had spent his entire life, with the exception of a few years, in Aurora, where he graduated from the high school in 1911 or 1912. He had always enjoyed good health, and was mentally well balanced. He learned the printing business at the Burr Publishing Company at Aurora, and became an operator upon the linotype, and supported himself at that occupation while attending the State University at Lincoln for two years. He was very devoted to his parents, and particularly attached to his sister Frances, having been her pal from their earliest childhood days. He enlisted and served in the United States navy during the war, and remained in the navy for some time thereafter, writing many letters home, inclosing snapshots. One of these letters was found, and introduced in evidence, which was written by him to his mother from Honolulu. It discloses somewhat intimate details of the young man's life and thoughts, and reads, in part, as follows:

"Army and Navy
"Young Men's Christian Association
"With the Colors
"Dec. 27, '18

"Dear Mother: Just got your letter and the box. I can use the wrist-gloves or whatever you call 'em fine.

The cookies were sure good, tasted nice and fresh, got two of them in my pocket. The socks come in handy; I needed some. The tooth paste and shaving soap will be useful. I was just out of tooth paste. I am smoking one of the cigarets now. If the Oregon goes for a trip, they will be almost indispensable. * * * Yes, I got the cake on Thanksgiving. Didn't I tell you before? * * *

"Frances said something about her blouse in her last letter. I spent what she sent for a blouse, but I'm afraid the sleeves are too short for her, so I'll get one on pay day that will be all right. Tell her she don't need to send me any more money,—I'm not used to it any more. I've been getting along without it quite often lately and not really missing it.

"Dad should get my $50 bond on the 3d loan some time in February. If he can take care of my insurance premium I'll send him the balance as soon as he will let me know how much it is.

"Christmas day was quiet. We had nice weather,—lots to eat,—see menu inclosed. They left the food on the tables all afternoon and we could eat at any time. Our candy was made on the island and was regular Christmas candy. * * *

"I guess I've answered all questions & told all the news. Lots of love from Russel."

There is another letter in the record that was written to his father from Long Pine, Nebraska, and reads, in part, as follows:

"The Long Pine Journal
"A. R. Munson, Editor
"Long Pine, Nebraska
"Published in 'Nebraska's Hidden Paradise'
"June 23, 1923.

"Dear Dad: There's not much to write about, except to let you know I'm still 'kicking.' * * *

"Receipts last month were a little short and expense a little long so I did not come out very good. This month will be better so far as the newspaper is concerned. There

is about $50 worth of job work to collect so far. Of course, the rest of the month may more than double the job work total. It's been pretty quiet for several weeks. I think I'll let one of the boys go after another week. The boy I keep gets $15 a week, the one I'll let go $10.

"I got two spinners today and think I'll go down to the creek (½ mile) and have a try for a trout. They bite (strike) good about dusk. It is almost like fishing in your backyard.

"I hope mother is getting along all right. I don't figure on you being other than as usual. Give Frances & Jean and M. J. a kiss for me. Love,

"Russel."

While he attended the university, and also while he lived in Aurora, he was an active member of the Nebraska National Guard. He had purchased the Long Pine Journal, and was paying for it on a contract, and drove from Long Pine to Omaha about the middle of September, 1923, and secured some engraved wedding announcements, which he had ordered for his sister's wedding, which was to occur October 15, 1923. He had his own ideas about the proper form of wedding announcements, and purchased these for his sister and took them from Omaha to Aurora and delivered them personally to his sister, saying that this was his wedding present to her. While he remained in Omaha on this trip, he traded off his old car for a second-hand Ford, and drove that to Aurora. He visited in Aurora for several days, and then he bade his family goodbye, promising Frances to be on hand sure for her wedding, which was to occur so soon. From the time he drove away from his home at Aurora that day, nothing has ever been seen or heard of this young man, or the car that he was driving. He had no bad habits, such as gambling or drinking. There is not the slightest indication that he contemplated suicide, nor has there been disclosed any motive or reason for him to abandon his growing business at Long Pine or his family at Aurora. It is logical to draw the conclusion from such

evidence that he was made away with, against his will and by violence, at some date between the hour he left his family at Aurora and the date of his sister's wedding, October 15, 1923. Automobiles abandoned by the owners are easily found and identified, but a criminal hitchhiker often uses the automobile of one he has made away with to make his escape to a far distant country.

When it was found that he had disappeared, his father sent out radio announcements from WOW, radio station at Omaha, broadcasting his disappearance. All of the relatives of the family in Colorado and on the Pacific coast were communicated with. Newspapers were scanned, and the father sent his picture and all of his credentials to the navy department, seeking their help in locating him, and after a voluminous correspondence they were unable to get any track of him. The father watched the newspapers very carefully for disappearances, and every other shred of information that would throw light upon his son, up until the time of his death, September 30, 1929, and the state newspapers that carried the account of the father's death also carried full details of the disappearance of the son, Russel Munson.

The law seems to be well established that the presumption of death after an unexplained absence for seven years does not necessarily imply that the person died at the end of that period, but that, after seven years of unexplained absence, the presumption of death requires that the one who asserts that he is alive must prove it, and, on the other hand, if it is asserted that the one who disappeared died in less than seven years, the burden is then upon the one asserting that death occurred at some particular time prior to the termination of the seven years to prove that fact. See *Holdrege v. Livingston*, 79 Neb. 238; *McLaughlin v. Sovereign Camp, W. O. W.*, 97 Neb. 71; *Rosencrans v. Modern Woodmen of America*, 97 Neb. 568; *McLean v. Grand Lodge, A. O. U. W.*, 59 S. Dak. 17; *Crane v. Grand Lodge, A. O. U. W.*, 106 Neb. 291; *Masters v. Modern Woodmen of America*, 102 Neb.

672; *Davie v. Briggs,* 97 U. S. 628; *Haddock v. Meagher,* 180 Ia. 264; *Bonslett v. New York Life Ins. Co.,* 190 S. W. (Mo.) 870.

"Presumption of continued life of one who has disappeared from his home and the knowledge of his family, in the absence of proof to the contrary, continues for seven years. At the end of that time, and not until then, it ceases to operate and the presumption of death takes its place. The latter presumption is to the effect only that the missing one is not then alive and does not prove death at any precise time within the seven-year period." *Goodier v. Mutual Life Ins. Co.,* 158 Minn. 1, 34 A. L. R. 1383.

"Thus evidence of character, habits, domestic relations, and the like, making the abandonment of home and family improbable, and showing a want of all those motives which can be supposed to influence men to such acts, may be sufficient to raise the presumption or to warrant an inference of the death of one absent and unheard from, without regard to the duration of such absence." 8 R. C. L. 712, sec. 8. See *Tisdale v. Connecticut Mutual Life Ins. Co.,* 26 Ia. 170, 96 Am. Dec. 136.

A member of a mutual benefit association had paid all the assessments made on him by the association up to the time when he disappeared. The association thereupon declined to accept payment of the assessment coming due subsequent to his disappearance, tendered by the beneficiary named in the certificate, on account of such disappearance, and did no longer make any assessments on him. Held, (in an action brought on such certificate after seven years from the disappearance of such member had elapsed) that, the presumption being that he was dead, the beneficiary was entitled to recover on the certificate. *Supreme Commandery of K. G. R. v. Everding,* 20 Ohio C. C. Rep. 689, 11 O. C. D. 419; 14 Deitch, Digest of Insurance Cases, 352.

It has long been the law that, if an absentee was in contact with a specific peril, as a shipwreck, such circumstances might raise a presumption of death without

regard to the lapse of the seven years. Other circumstances may well create the same presumption, as where the circumstances of the disappearance are more consistent with the theory of death than that of the continuance of life when considered with reference to those influences and motives which ordinarily govern men, in either of which cases the jury may infer death at any time within the seven years, such as may seem to it most probable. 104 Am. St. Rep. 206, see notes; *Lancaster v. Washington Life Ins. Co.*, 62 Mo. 121.

"To raise the presumption of death at any particular time special facts and circumstances should, however, be shown, reasonably conducing to that end. The evidence need not be direct or positive, but it must be of such a character as to make it more probable that he died at a particular time than that he survived." 8 R. C. L. 712, sec. 8.

This court has very recently had a similar case before it, entitled *Fredrikson v. Massachusetts Mutual Life Ins. Co., ante,* p. 240, in which we reviewed many of the Nebraska cases relating to disappearances. *Thomas v. Thomas,* 16 Neb. 553, alleged the death of a former husband because of seven years' absence. In *Cox v. Ellsworth,* 18 Neb. 664, this court considered the common-law presumption of death after seven years. This was an equity case to reform a deed, and it was there held: "Evidence of character, habits, domestic relations, and the like, making the abandonment of home and family improbable, and showing a want of all those motives which can be supposed to influence men to such acts, may be sufficient to raise the presumption of death, or from which the death of one absent and unheard from may be inferred without regard to the duration of such absence."

In order to recover in the case at bar, the plaintiff is required to show that the insured came to his death prior to November 14, 1923, when the policy became in default for the nonpayment of premiums. This court has had several cases of this nature.

Judge Letton decided the case of *Coe v. National Council of K. & L. of S.*, 96 Neb. 130, L. R. A. 1915B, 744, Ann. Cas. 1916B, 65, and used as his syllabus the two paragraphs which were first announced in the case of *Cox v. Ellsworth, supra.* In this *Coe* case, Dr. Ganson was sleeping in a little tent in his back yard with a young son. At 2 o'clock in the morning the boy cried, and the mother found that the father was not there. At 6 o'clock in the morning his bicycle was found at Riverside Park, Omaha, near the Missouri river, his clothes were on a stick stuck in the mud on the bank of the river, and tracks of a barefoot man led from this point to the water's edge. The river was dragged, dynamite was used, and a day or so later men who were working in a brickyard testified they saw a body floating down the river. Judge Letton said that all of his clothing was accounted for. It was not shown that he was in possession of any money. His last known appearance in life was when he stood unclad upon the bank of the treacherous Missouri river, and a naked body was seen a few days afterward in the river at a point below, and that these facts were sufficient to justify the district court in finding that he died as alleged in the petition, the presumption being that he died as of the date he entered the water.

A watchman upon a railroad bridge in Omaha disappeared, his cap being found upon latticework, and his lunch uneaten. This court said: "The defendant offered to pay if 'positive proof' was furnished. This must be held to mean proof as positive as the circumstances reasonably afford, and positive enough to satisfy the judgment of reasonable men. Otherwise, where, as in convulsions of nature, such as floods, tornadoes and tidal waves, or in catastrophes, such as conflagrations or explosions, where it is very frequently impossible to furnish absolute proof of death by the production of the body, the insurer might escape a just liability." *Mitchell v. Brotherhood of Locomotive Firemen and Enginemen,* 103 Neb. 791.

In former times, as has been stated herein, the loss of

a ship at sea, or the burning of a building, were held to be special perils on a definite date, and if one who had been in the ship or building was never seen thereafter, the courts decided that the absentee had come to his death on that day.

Today more people are subjected to the perils of automobile traffic than are killed in burning buildings or lost ships, for these modern, fast, and reliable cars are being used to make hazardous trips in every continent, not only across deserts and mountains, but to the most desolate regions. Trips are made daily by lone drivers in automobiles which formerly would not have been undertaken, except when several men were traveling together, prepared for the dangers of the road. Even along the most frequented highways, all traffic must make certain legal stops, at which hikers have the opportunity to forcibly board a car against the driver's wishes. Other drivers, with no thought of danger, will invite a criminal to ride with them, whose only desire is to obtain possession of their car at any cost. Our daily newspapers often carry accounts of perils to automobilists from fleeing gangsters.

It is insisted that no such criminal acts have been proved in this case. True, but a fine young man has been lost to this world by an unknown peril. Why should a court shut its eyes to the known dangers found in automobile traffic, when such dangers are not only the possible but the probable cause of his untimely disappearance?

Presumptions founded on a reasonable probability must prevail as against mere possibilities; otherwise, the conclusion could never be arrived at, that a man was dead, until the natural limit of human life had been reached. *Merritt v. Thompson*, 1 Hilt. (N. Y.) 550.

Let us briefly review the evidence in the case at bar which relates to the time of death. A single young man, who was healthy, sober, industrious, and of excellent habits, had a deep affection for the members of his family, and never remained away from home for any considerable

length of time without writing to them, suddenly drops out of sight. This young man, who was of a hopeful and contented disposition, and satisfied with his lot in life, who was prospering in business, and whose principal recreation was trout fishing, starts out on this last automobile trip with only $11 in his pockets. This trip is a cross-country journey, requiring the traversing of eight or nine counties, one of them inland, without railroads or main highways, and which counties 11 years ago were very sparsely settled, up in the sandhill and lake country of north central Nebraska. This young man leaves, promising his sister, for whom he had unusual affection, that he would return shortly for her wedding, plans for which marriage he had been much interested in, announcements for which he had designed and had had engraved at his own expense. It must be quite evident that he would have been back in Aurora for this wedding on October 15, 1923, if he had not been overtaken by some calamity. Is the presumption of his death, prior to October 15, 1923, founded on a reasonable probability? We hold that it is, because the habits, character, domestic relations, which were unblemished, as well as his promise to attend an important event; in fact, all the facts and circumstances, except only his exposure to the special perils of a lone automobilist upon unfrequented roads, make it certain that, if alive within the period set out, he would have returned to, or communicated with, his parents or sister. *Reedy v. Millizen,* 155 Ill. 636. The reason that such evidence raises a presumption of death is obvious; absence from any other cause, being without motive, and inconsistent with the very nature of the person, is improbable. Such absence might be on account of insanity, but as death under such circumstances is more probable than insanity, in the entire absence of the slightest evidence thereof, the law raises the presumption of death. Lawson, Law of Presumptive Evidence, 289.

The district court tried this case without the assistance of a jury, and its findings are, therefore, entitled to great

weight. In the judgment entered by it, we find this paragraph: "The court further finds that the deceased was so circumstanced and possessed of such a character and habits at the time he disappeared, about the middle of September, 1923, that no other reasonable inference is to be drawn from his disappearance than that he died soon after his disappearance, and that his death took place between the middle of September, 1923, at the time he left the home of his parents in Aurora, Nebraska, and October 15, 1923, the time his sister, formerly Frances Munson, was married."

The record has been examined by this court, and sustains the judgment entered for the plaintiff. Attorney's fees in this court allowed in the sum of $150.

AFFIRMED.

DAY, J., dissenting.

As a matter of law, an automobile drive from Aurora to Long Pine is not a special peril comparable to a loss of a ship at sea or a burning building sufficient to justify an inference that death occurred at a certain time. This conclusion is not supported by the evidence in the record, and my personal experience, even if a proper consideration, does not impel me to agree.