ALICE WELLS, APPELLEE, V. EQUITABLE LIFE ASSURANCE SOCIETY, APPELLANT.

FILED APRIL 10, 1936. NO. 29477.

*Brown, Fitch & West,* for appellant.

*Crofoot, Fraser, Connolly & Stryker, Thomas C. Quinlan* and *Leslie F. Johnson, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

PAINE, J.

This is a suit at law by the widow of an employee of the Union Pacific Railroad Company upon a group insurance policy issued by the Equitable Life Assurance Society. The jury returned a verdict for $1,660.97, being one year's wages of deceased. The insurance company appeals.

Samuel F. Wells, aged 47 years, was a steamfitter, and worked for many years for the Union Pacific Railroad Company at Omaha. A group insurance policy was secured and held by the railroad company upon all its employees, and a simple certificate based thereon was issued to each employee.

Mr. Wells gradually developed a mental trouble that was somewhat unusual. He had fits of melancholy, and would sit around the house and would not talk. He once tried to kill himself by putting a gas tube in his mouth in the base-

ment, and also threatened to jump in the river, and mentioned other ways of committing suicide, and his condition gradually got worse as time went on. He would sometimes leave home and remain away for a whole day and tell nobody where he went, and at one time was gone two days and two nights.

The plaintiff had been married prior to her marriage to Samuel F. Wells, and had two sons by that marriage, and to one of these sons Mr. Wells became greatly attached, and loved him as he would an own son. This young man died very suddenly of pneumonia on March 15, 1925, at the age of 27, and Mr. Wells grieved greatly over his death. Mr. Wells was very nervous, and would not eat, and at times would not go to bed, would drive around aimlessly in his car, and his mental condition became more serious as time went on. The last day that he worked for the Union Pacific was Saturday, June 5, 1926. He came home at half past five, and the widow of this stepson, having concluded that she did not want to keep house any more, had sent back all of this stepson's furniture and all of the clothing and shoes and everything else that belonged to the stepson, and when Mr. Wells reached home this was all piled up on the front porch. His widow testifies that he went all to pieces, had no control over himself, took the car and went away, came back late, would not eat supper, went over to the store, paid the store bill, brought back some money and steak, and went away again in the car; would stay awhile and come back, telling nothing about where he was going; was depressed and despondent, and kept making these trips until midnight. Between 4 and 5 o'clock the next morning, being Sunday, June 6, 1926, he got up and got nothing to eat, went out the back door, took the car and drove away, came back about 9 o'clock, and did not tell where he had been. He would not talk to anybody, appeared to be heartbroken, drove away again, and came back about 5 o'clock. He refused to eat breakfast or dinner or supper, and gradually acted more depressed. He retired about 10 o'clock Sunday night, and about midnight got up, put on his hat and coat, and went

out the back door. He took no money with him, leaving his money on the dresser. He did not take his automobile with him, and the plaintiff testifies she never saw him after that time. A little later the widow got up, went out to the garage, down in the basement, and looked all around the yard. She notified the police station, and had his disappearance broadcast over the radio. He had no other relatives, either in Omaha or elsewhere, that the plaintiff ever knew of. There was no domestic difficulty in the family of any kind. She investigated during the next few months, personally or through friends, at undertaking establishments, the body of every man who was found dead.

The stepson, Frank C. Hazard, a meatcutter, was living at home, and came home from work late that Saturday night, June 5, and brought home some chili and asked his stepfather if he would help him eat it. He refused, and said he would not need anything more to eat. He was wild-eyed, and the stepson was afraid that he was going crazy. On Sunday night this stepson got home after midnight, and his mother sent him out looking for his stepfather; he went around three or four blocks, but did not find him. About a week after his stepfather disappeared, he testified, he went over to Council Bluffs to see a body which had been taken out of the Missouri river, but they told him the body had already been buried because it was bloated past recognition. It is undisputed that the records of the Union Pacific Railroad Company show opposite the name of Samuel F. Wells, "Dropped 6/14/26. Cause—Absent without leave."

On September 25, 1933, the plaintiff filed a petition against the Equitable Life Assurance Society, alleging many of the facts set out, and, further, that seven years had elapsed after the sudden and mysterious disappearance, and alleged that she believes the fact to be that Samuel F. Wells died on or about June 6, 1926, and praying that she be given a judgment for $2,160, being one year's wages, with interest from the time he disappeared.

To this an amended answer was filed, setting up the fact

that said Wells terminated his employment with the Union Pacific on June 5, 1926, and that the group insurance policy provided insurance upon the life of an employee of said railroad company only so long as such person remains in the employment of the company, and, further, that the action was barred by the statute of limitations of the state of Nebraska. The defendant assigns as grounds of error the admitting of the evidence of a fisherman of the finding of a body on June 14, over the objections of the defendant, and also the testimony of the stepson, Frank C. Hazard, in regard to said matter, and also sets out as error the refusal of the court to instruct the jury to return a verdict in favor of the defendant, or to dismiss the case for the reason that the evidence was insufficient to sustain a verdict in favor of the plaintiff.

The defendant insists that Wells was not an employee of the Union Pacific Railroad Company after June 5, the day he ceased to work, and alleges as error the giving of instruction No. 3 by the court on its own motion, setting out, in brief, that the presumption of death arises from a continued and unexplained absence of seven years where nothing has been heard from him by those who, were he living, would naturally hear from him; and then the instruction reads that it is not enough to prove that he died at some time during the seven-year period, but instructed the jury that plaintiff must go farther than that and present evidence which will preponderate and convince the jury as a matter of fact that Wells did come to his death prior to June 14, 1926, at which date he was dropped from the rolls as an employee of the Union Pacific Railroad Company, and this long instruction closed with these words: "And in considering this question you may consider his acts and demeanor, words and conduct to the extent that they are established by a preponderance of the evidence as being correctly given to you, as bearing on the question of his disappearance and claimed suicidal death." In our opinion, this instruction states the law correctly, and was proper under the evidence in this case.

A number of insurance cases involving disappearance have been before this court, one of the most recent being that of *Munson v. New England Mutual Life Ins. Co.*, 126 Neb. 775, 254 N. W. 496, in which it was held that the presumption of life of an absentee continues for seven years, but after seven years of unexplained absence the presumption is that the missing one is not then alive, and that such presumption of death after seven years requires that he who asserts an absentee is then alive must prove it, but, on the other hand, if it is asserted that an absentee died in less than seven years, the burden is on the one so claiming to prove such fact. It is further held: "To raise the presumption of death at any particular time less than the seven-year period, facts and circumstances of special peril must be shown which make it more probable that he died at a particular time than that he survived." See 8 R. C. L. 712, sec. 8; *Fredrikson v. Massachusetts Mutual Life Ins. Co.*, 126 Neb. 240, 252 N. W. 802; *Yates v. New England Mutual Life Ins. Co.*, 117 Neb. 265, 220 N. W. 285; *Warner v. Modern Woodmen of America*, 124 Wash. 252, 214 Pac. 161; *McLaughlin v. Sovereign Camp, W. O. W.*, 97 Neb. 71, 149 N. W. 112; *Rosencrans v. Modern Woodmen of America*, 97 Neb. 568, 150 N. W. 630; *Coe v. National Council of K. & L. of S.*, 96 Neb. 130, 147 N. W. 112.

The defendant insists that, if the plaintiff proved the death to have occurred prior to June 14, 1926, then the cause of action was barred by the statute of limitations. This brings the question squarely before this court as to when the five-year statute of limitations began to run in this case. Employee's certificate No. 40768, which was delivered to Samuel F. Wells, had no requirements about making proof of death; but when we examine exhibit No. 2, being the copy of the original group life insurance policy, No. 5170023, issued by the defendant company to the Union Pacific Railroad Company, and dated August 13, 1921, we find it provides: "And on receipt of due proof of the death during said term of any such employee (provided this policy is then in force as to such employee)." It is

therefore necessary, in order to collect on this policy, that due proof of death should be made, and as due proof of death cannot be made in a disappearance case until seven years have elapsed, then no cause of action accrues until that date. This is well stated in 7 Couch, Cyclopedia of Insurance Law, 5728, sec. 1640: "Where it is necessary to rely on the presumption of death arising from seven years' unexplained absence, the general rule is that the cause of action accrues at the expiration of the seven-year period, so that proofs of loss cannot be made before such expiration, and, in the absence of contract or statutory provision to the contrary, limitations run from the date thereof; that is, where limitations run from the date of death, and death is established by the presumption arising from seven years' unexplained absence, the limitation period runs from the date when the presumption of death arose. In fact, in case death has to be inferred from seven years' unexplained absence, proof of death cannot be made until the expiration of such period, and, consequently, the statute of limitation does not begin to run until such proofs can be made." This statement is amply supported by decisions cited in the foot-notes from California, Iowa, Minnesota, Massachusetts, Pennsylvania, Texas, Washington, and Canada.

In the case of *New York Life Ins. Co. v. Brame,* 112 Miss. 828, 73 So. 806, L. R. A. 1918B, 86, it was said that it was imperative to ascertain when the cause of action actually accrued, for the insurance company agrees to pay the amount due on the policy immediately upon the receipt and approval of proof of death of the insured, and where both the insurance company and the beneficiary were uncertain as to the fact of death, it would be harsh, inequitable, and unjust to hold that the statute of limitations was applicable.

It is the opinion of this court that in a disappearance case the cause of action does not accrue until the expiration of the seven-year period, for death is then established by the presumption then arising, and the limitation period runs from the termination of the seven-year period.

The last question which arises is this: Granting that

proof of loss cannot be made until the seven-year period has elapsed, is it then allowable for the jury to show by their verdict that in their opinion death occurred prior to June 14, 1926? It is the law that the jury have the right to weigh all the evidence and to determine the date of death.

In the instant case, where a man has a permanent job at good wages, and his home life is happy and in every way agreeable, but in spite of all this he has shown increasing mental disease, had threatened and attempted suicide, and has repeatedly absented himself from home without cause, is greatly upset and shocked by a family occurrence, after which he does not partake of food and misses several consecutive meals, his conduct is such as to cause his relatives to fear he is becoming crazy, and he leaves all his money on the dresser and walks away from home about midnight on June 6, 1926, and is never seen again, and never communicates with the members of his family, for whom he has shown unusual attachment, and a body of a man is taken out of the Missouri river in a bloated and unrecognizable condition about a week later, the jury would therefore be justified in finding that he died prior to June 14, 1926.

We have examined the entire record, and, finding no prejudicial error, the judgment is affirmed, and an attorney fee of $150 allowed in this court.

AFFIRMED.