## CATHERINE KRELL v. MARYLAND DRYDOCK COMPANY, ET AL.

[No. 16, January Term, 1945.]

430

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*Paul Berman* and *Eugene A. Alexander, III,* with whom was *Avrum K. Rifman* on the brief, for the appellant.

*William D. MacMillan,* with whom were *Harold Tschudi* and *Semmes, Bowen & Semmes* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

Catherine Krell, appellant here, filed with the State Industrial Accident Commission a claim on her behalf and on behalf of her three dependent children for compensation. She alleged that her husband, Theodore H. Krell, died on October 28, 1943, as a result of an injury sustained by him that day in the employment of the Maryland Drydock Company, his average weekly wage being $68. She further alleged that while working on a pier, he fell overboard and drowned. After a hearing before that Commission on July 7, 1944, the claim was disallowed. From that decision she appealed to the Baltimore City Court. After trial before a jury, on October 16, 1944, the appellee offering no evidence, the trial judge

granted the employer's and insurer's A and B prayers: (a) instructing the jury that the claimant had offered no evidence legally sufficient to establish the fact that Theodore Krell died on or about October 28, 1943, and (b) that no evidence was offered legally sufficient to establish the fact that Theodore Krell died as a result of an accidental personal injury sustained by him arising out of and in the course of his employment by the appellee on that date. The Court further directed a verdict for the appellee. From the judgment entered on that verdict, the appellant appeals to this Court.

Substantially, the evidence presented by the appellant at the trial below follows. Theodore H. Krell at the time of the alleged accident was forty-seven years of age, and his wife, thirty-nine years old. They were married on October 24, 1923, and had lived together ever since that time with no domestic or financial difficulties. They went out occasionally to moving picture shows, to see his friends, his family, and his mother. They had six children, three of whom were dependent upon the husband for support. He treated his wife and children well, had a happy disposition, worked regularly and except for an occasional glass of beer, drank very little. He was a dutiful son and a good husband and father. He had been working for his employer for about ten years and recently ten hours a day, seven days a week. His health was good, and he had not been treated by a doctor since his marriage. On the morning of the alleged accident his health and disposition seemed to be as usual with no domestic or financial difficulties. He apparently had no reason to leave home. He enjoyed the respect of his fellow employees with whom he was popular and was regarded as sober, upright, dependable and one who never required much supervision.

He was employed as a fireman and guard. It was his duty to see that every ship came into the yard had proper fire protection equipment aboard, fire hose, fire extinguishers, and general fire fighting equipment. It was his duty to see that the hose was placed on the bow part of

the ship on different decks, where there was more than one deck, leading directly to and connecting with the fire hose connection on the pier. He was required to make occasional trips during his eight-hour shift to see that these hoses were still in proper condition and available for fighting fires. If a ship left the yard, he was required to go aboard approximately one half to three quarters of an hour before leaving time and clear the ship of fire-fighting equipment, place it on the pier and store it until again needed.

There are five piers at the Maryland Drydock Company from 600 to 800 feet long with no rails. The water runs from 15 to 20 feet in depth. Ocean-going merchant vessels, tankers, and navy boats tie up at these piers. In addition to the piers there are four floating drydocks located one between each pier. On October 28, 1943, there were about eighteen vessels tied up at the Maryland Drydock. To get from the pier on the boats there are normal stairs with hand rails. In some cases there is a temporary ladder placed on each side of the boat for the safety of the workmen in the event that something might happen. There are ladders on the pier to the bulwark of the ship. The sides of the ships which Krell was supposed to board are from one to two feet from the piers depending upon the tide and wind.

The property of the Maryland Drydock Company runs about three quarters of a mile along the water front. In addition to the boats that are tied up at the piers, there is a ferry that comes in on the east side of the Maryland Drydock property. A gate leads from the premises of the Maryland Drydock to the ferry pier. It is not possible for any one to get out of the property of the Maryland Drydock Company without going through a gate at which there are guards if the gate is open, or by boat other than the ferry. When a workman leaves the yard during working hours, his number is taken. When a guard leaves the yard, his number is not taken, but the other guards are in a position to see him go in and out. The time for the change of shift on which Krell was working was

4:30 P. M. He worked from 7 to 3 in the yard and from 3 to 5 on the parking lot outside the gate directing traffic.

On the alleged date of death, Mr. Krell rode from his home to his work in the automobile of John A. McMullen, his immediate boss, a lieutenant of guards at the Maryland Drydock Company. He had been riding to work with McMullen every morning and home every evening for three or four months. On his way to work he wore plain work clothing and a felt hat. He would work in the same clothes except that he would change to a uniform hat. He checked in at the plant and was seen by McMullen at 11 o'clock that morning.

He was last seen at about 2 P. M. by Captain Burling L. Rogers who was in charge of plant protection and security. At that time Rogers looked out of his office window which is below the level of the ground, and he saw Krell walking on the ground along the edge of the seawall toward No. 3 drydock. The seawall is of concrete and about the same width as the street, 20 or 25 feet wide, wide enough for two trucks to drive along it and adjoins the water and has a slope of about 12 inches. He was walking a little faster than usual, dressed in a raincoat and with a rain cover over his cap. Walking along anywhere in the yard would have been in line with his work. Rogers does not know whether he had on rubber boots or not as he could not see below his knees. The guards usually wore rubber boots in rain or snow. It had been raining all that day, off and on. At the time Krell was seen by Rogers, it had cleared off somewhat, but it was probably misty. When Krell failed to show up at the parking lot about 3:15 P. M., McMullen began to inquire in the yard to determine if he had been seen. Neither the guard whom Krell was supposed to relieve at that time nor any of the guards on the piers or at the entrance gates had seen him.

CaptainRogers, about 5 P. M., received a call stating that they could not locate Krell. Immediately a searching

party was organized throughout the yard in all the buildings everywhere in the yard, on the ships, around the water front, on the parking lot and everywhere where it was thought he could be. The day shift was kept overtime that night and about eight men stayed until dark, and they searched every ship there. Instructions were issued as each shift came in to search the ships, and a detail was assigned as a searching party.

The Baltimore City Police Department was notified, and the police boat proceeded to drag around the piers and along the seawall and around the drydocks. The police boat of the Maryland Drydock Company continually patrolled in and around the piers. About two days later a diver was called in to go down around one of the piers and drydocks. A few days later a long line equipped with welding rod hooks was seesawed from one side of the drydock to the other. Captain Rogers testified that he does not know of anything that could have been done to locate Krell that had not been done and further that everyone in the yard was looking for him and that there were from forty-five hundred to five thousand men employed there. Krell's locker was searched and in it were found his hat and shoes worn to work by him that morning. His work card showed that it was not punched out that day.

Testimony was offered by Dr. Robert Lee Graham, specializing in post mortem examinations, that in cold weather a drowned body often does not come to the surface, but in the springtime when the water gets warmer, bodies usually rise to the surface. Edward B. Kilchenstein, a detective sergeant of the Baltimore Police Department, testified that Krell's description was placed on a teletype, given to all the districts in Baltimore City, placed on lookout sheets, and sent through the mail to forty-three cities.

Although a year, with the exception of nine days, had elapsed between the date of Krell's disappearance and the date of judgment, according to the testimony he has never been seen since.

As no one could leave the property of the Maryland Drydock Company by land without going through a gate at which guards were stationed and as he was not seen to pass through these gates, the conclusion of this Court from the facts here presented in this case is that at the time of his disappearance, he was "fenced in" and occupied a position similar to one who disappears on a ship.

By Code 1939, Article 101, Section 79 (c) there is a presumption that the death, if it occurred, was not occasioned by the willful intention of the employee, himself, or of another.

The appellant is faced with certain presumptions.

When a person has been shown to have been living at a given time and has not been absent or unheard of continuously for seven years, the continuance of life will be presumed until the contrary is proved or inferred from the nature and circumstances of the case. *Jones on Evidence in Civil Cases*, 4th Ed., Sec. 60; *Schaub v. Griffin*, 84 Md. 557, 564, 36 A. 443; *Robb v. Horsey*, 169 Md. 227, 239, 181 A. 348; *Lachowicz v. Lechowicz*, 181 Md. 478, 30 A. 2d 793.

By Article 101, Section 70 of the 1939 Code, the decision of the Commision is *prima facie* correct, and the burden of proof is on the party attacking that decision. It has been frequently held by this Court that the burden of proof is upon the party attacking it to show error in the decision of the Commission which must on appeal be taken as *prima facie* correct. *Jewel Tea Co. v. Weber*, 132 Md. 178, 182, 103 A. 476; *Beasman & Co. v. Butler*, 133 Md. 382, 105 A. 409; *Stewart & Co. v. Howell*, 136 Md. 423, 110 A. 899; *Thistle Mills, Inc. v. Sparks*, 137 Md. 117, 111 A. 769; *Todd v. Easton Furniture Co.*, 147 Md. 352, 128 A. 42; *Atlantic Refining Co. v. Forrester*, 180 Md. 517, 523, 25 A. 2d 667.

In the instant case the facts were proved without contradiction, and in such cases where there is no dispute as to any material inference of fact, the Court may decide the issue as one of law. *Beasman & Co. v. Butler*, supra, 133 Md. 387, 105 A. 409; *Harrison v. Central Construc-*

*tion Co.*, 135 Md. 170, 180, 108 A. 874; *Schemmel v. T. B. Gatch & Sons, etc., Co.*, 164 Md. 671, 675, 166 A. 39. In the case at bar, although there is no dispute as to the facts, there is serious dispute as to the inferences to be drawn from those facts. *Todd v. Easton Furniture Mfg. Co.*, supra; *Schemmel v. Gatch & Sons*, supra, 164 Md. 673, 675, 166 A. 39; *Moore v. Clarke*, 171 Md. 39, 46, 187 A. 887. It was said by this Court in *Schemmel v. Gatch & Sons, etc., Co.*, supra, 164 Md. at page 675, 166 A. at page 40: "But, as pointed out by Judge Pattison in *Catherman v. Ennis* [164 Md. 519], 165 A. 482, where the facts proved before the commission are susceptible of a construction supporting the decision of the commission as well as a construction adverse thereto, the appellant on appeal has theoretically the burden of showing that the commission drew the wrong inference, but that is more a rule of logic than of law."

This Court here is not called upon to render a decision (1) as to whether Theodore H. Krell died on the date alleged or (2) whether his death arose out of an accidental personal injury sustained in the course of his employment. It is our duty to decide whether there was legally sufficient evidence such as to give the jury the opportunity under proper instructions as to burden of proof to determine those questions upon the facts presented and the material inferences of facts therefrom.

(1) The case of *Tisdale v. Connecticut Mutual Life Ins. Co.*, 1868, 26 Iowa 170, 96 Am. Dec. 136, a leading case, involved a suit on a policy of life insurance upon the life of one Edgar Tisdale. He was a young man of excellent character, habits, fair business prospects, well connected, and of the most happy domestic relations, and owed little money. He had the entire affection of his wife, confidence of his friends, and lived in apparent happiness with no visible cause to break his domestic and social ties. On September 25, 1866, he visited Chicago on business and was last seen by an acquaintance on a corner in that city in the afternoon of that day. Not the faintest trace of him had been found at the time of the

hearing in December, 1868. A large reward had been offered through the newspapers, and detectives were employd to search for him without results. The latest declaration of his intentions was to the ffect that he expected to leave Chicago the day of his disappearance to join his wife. His valise was found at his hotel containing clothing and other articles usually carried by travelers. His hotel bill was unpaid.

The Court said in that case at pages 175 and 176, of 26 Iowa, 96 Am. Dec. 136: "The questions for our determination in this case relate to the correctness of the instructions given by the court to the jury. The first instruction announces the rule that the death of an absent person cannot be presumed, except upon evidence of facts showing his exposure to danger, which probably resulted in death, before the expiration of seven years from the date of the last intelligence from him; and that evidence of long absence without communicating with his friends, of character and habits, making the abandonment of home and family improbable, and of want of all motive or cause for such abandonment which can be supposed to influence men to such acts, is not sufficient to raise a presumption of death. The instruction is not in accordance with the true rule of evidence, and is erroneous. The error is evidently the result of an improper construction of the familiar rule of evidence, that, when a person has not been heard of for many years, the presumption of duration of life ceases at the end of seven years (2 *Starkie's Ev.* 361), and an attempt to apply it to the facts in this case. The rule by no means limits the presumption of death to an absence of the person whose existence in life is in question without tidings from him for the space of seven years; nor does the modification of the rule laid down in the cases cited by defendant's counsel, that such absence for a shorter period, if the person is shown to have been in peril, will raise a presumption of death, exclude evidence of other facts and circumstances which tend to establish the probability of his death."

The Court held that facts and circumstances relating to character and prosperity were admissible to explain the conduct of such an honored and upright citizen who apparently had no reason to wantonly abandon his family and friends. And further at page 177 of 26 Iowa, 96 Am. Dec. 136: "The competency of evidence of the character above indicated, from which the fact of the death of an absent person may be found within the period of seven years, is well sustained by authority. 2 *Greenl. Evid.*, Sec. 278; *Angell on Fire & Life Ins.*, Sec. 351; *Doe v. Flanagan*, 1 Kelly, 543; *White v. Mann*, 26 Me. 376; *Smith v. Knowlton*, 11 N. H. 197."

In *Fidelity Mutual Life Ass'n v. Mettler*, 1902, 185 U. S. 308, at page 316, 46 L. Ed. 922, an objection was made to the following charge given by the lower court in a case where death was claimed and the body not found: "While death may be presumed from the absence, for seven years, of one not heard from, where news from him, if living, would probably have been had, yet this period of seven years during which the presumption of continued life runs, and at the end of which it is presumed that life ceases, may be shortened by proof of such facts and circumstances connected with the disappearance of the person whose life is the subject of inquiry, and circumstances connected with his habits and customs of life, as, submitted to the test of reason and experience, would show to your satisfaction by a preponderance of the evidence that the person was dead." The United States Supreme Court held in that case that the lower court did not err in giving that instruction and that it was not necessary that the death should be proved beyond a reasonable doubt and further that the party on whose side the weight of evidence predominated was entitled to a verdict. The Court also held at page 318 of 185 U. S., at page 922, of 46 L. Ed., that the lower court did not err in refusing the following instruction on the grounds that such an instruction was uncalled for and calculated to mislead: "* * * unless the jury believed from the evidence that William A. Hunter, Jr.,

when last seen was in a position of peril, such as that it is more probable that he then and there lost his life than that he extricated himself from such perilous position alive, you must find for the defendant."

In *Brownlee v. Mutual Ben. Health & Acc. Ass'n*, 9 Cir., 29 F. 2d 71, a suit on an accident insurance policy where the insured was returning from a mountain climbing expedition and had never been seen again alive or dead, the Court said at page 75 of 29 F. 2d: "It is, of course, possible that a body could have lain in an open space, and not have been found; but there was evidence enough to leave that question for the determination of the jury. It is not necessary that evidence be of such weight as to preclude every possibility of error. It is only necessary that there be substantial evidence to support the conclusion reached. The search which the evidence showed was made was sufficient to leave it a question for the jury to determine whether death was the result of accident or one of the other possible causes."

A recent case on the points pertinent here is *Gero v. John Hancock Mutual Life Insurance Co.*, 1941, 111 Vt. 462, 18 A. 2d 154, 155, 161. This case involved a suit by the beneficiary on three insurance policies issued upon the life of one Edward W. Gero. There were two main issues in that case—(a) whether the insured was dead or had disappeared in life; (b) whether if dead, his death had resulted through external, violent, accidental means as provided for in the policies. The insured was a purser on a steamer operating on Lake Champlain. He was last seen on the main stairway at about 1:48 A. M. in his uniform, when the boat was about two and one-half miles from its destination and one-half mile off shore and twelve or fourteen minutes before coming to the dock. The lake at that point averaged about 75 feet in depth with little current. The night was calm and the insured could dive and swim. When the insured did not appear at 8 A. M. that morning, a thorough search was made throughout the boat. The harbor in the vicinity of the dock was dragged, but nothing was found. The in-

sured had never been seen or heard of and no trace of him alive or of his dead body had been discovered. The bed in his room had not been slept in although it had the appearance that some one had been lying upon it. His civilian clothes were found in the room. He was happily married, of good moral character, temperate in habits, cheerful in disposition, and with no financial worries.

The defendant presented an instruction: "That on all the evidence in the case a finding that Edward W. Gero died on July 16, 1938, rather than disappeared in life is mere speculation and conjecture and that the jury has no right to make a finding of death, and that the Court direct the jury to return a verdict for the defendant on this ground." This instruction was refused and as to that refusal the Supreme Court of Vermont said that there was no error in refusing it; that the fact of the death and the date could be shown by circumstantial evidence; that there was enough if the circumstances taken together reasonably tend to support the inference sought to be drawn therefrom; that there was in that case no presumption of death after seven years' absence unheard of, and the fact of death was not to be inferred from the disappearance alone. It was further stated that according to some decisions, the fact and time of death within seven years of disappearance may be inferred only when the absentee is shown to have been exposed to some peril carrying with it the imminent danger of extinction or when his health or habits were such as to render his continuance in life unlikely.

It was there stated that the great weight of authority, however, is to the effect that the inference may be also drawn from other circumstances than those just mentioned and cited with approval to sustain this weight of authority, *Tisdale v. Connecticut Mutual Life Ins. Co.,* supra, 26 Iowa 170, 96 Am. Dec. 136; *Carlson v. Equitable Life Assur. Soc.,* 188 Minn. 43, 246 N. W. 370, 372; *Praetorians v. Phillips,* 184 Okl. 521, 88 P. 2d 647, 652; *Spahr v. Mutual Life Ins. Co.,* 98 Minn. 471, 108 N. W. 4, 5; *Springmeyer v. Sovereign Camp,* 144 Mo. App. 483,

129 S. W. 273, 275; *Sovereign Camp v. Piper, Tex. Civ. App.*, 222 S. W. 649, 651. The Court pointed out that the unexplained disappearance of this industrious, temperate man with apparently no worries, together with the want of all such motives as are supposed to influence men to abandon their families, warranted the jury in drawing the inference that death took place at or about the time of the disapearance and that the fact of his death and the approximate time of it and whether he died through external, violent, and accidental means were questions for the jury to determine upon the evidence.

In the case of *Lesser v. New York Life Ins. Co.*, 1921, 53 Cal. App. 236, 200 P. 22, the insured, who had not been absent for seven years, was claimed to be dead. It was held that it was not necessary to produce evidence that the alleged deceased came in conflict with some specific peril to his life. The Court said in that case at page 23 of 200 P.: "The very nature of such cases is to the effect that the weight of the evidence is a question for the jury."

In the case of *Bernstein v. Metropolitan Life Ins. Co. of New York*, 1943, 139 Me. 388, 34 A. 2d 682, the insured disappeared on a boat trip between Boston and New York, and action on the policy was brought within seven months thereafter. The Court said at page 684 of 34 A. 2d: "These presumptions of life and death as well as the presumption against death by suicide may be repelled by sufficient proof of facts. Even during the seven-year period while the presumption of continuance of life exists, 'Death may be proved by showing facts from which a reasonable inference would lead to that conclusion * * *.' " See also *Northwestern Mutual Life Ins. Co. v. Stevens* et al., 1895, 8 Cir., 71 F. 258; *Coe v. National Council K. L. S.*, 1914, 96 Neb. 130, 147 N. W. 112.

(2) As to the contention that there was not sufficient evidence to present to the jury to establish the fact that Theodore Krell died as a result of accidental personal injury sustained by him arising out of and in the course

of his employment, the case of *Gero v. John Hancock Mut. Life Ins. Co.*, 111 Vt. 462, 18 A. 2d 155 supra, is also pertinent.

It was there argued that since the death must rest upon an inference to be drawn from the circumstances, the inference of the manner of death must be based upon the prior inference, which is not permissible. It was pointed out therein that *Wigmore on Evidence,* 3d Ed., para. 41, states that the rule forbidding an "inference upon an inference" is unorthodox and fallacious, but that this theory had been frequently applied by the Courts. It was also pointed out therein, which aptly applies to the case at bar, that a given set of facts proved to the satisfaction of the jury may give rise to two or even more separate inferences, and in such a case one inference is not built upon the other, but each is drawn independently from the same evidence. In that case it was recognized that there was legally sufficient evidence to justify the jury in finding not only the death of the insured, but the approximate time of it and that he was drowned. Likewise in the case at bar, on the same set of facts presented here the jury may find the death of the insured and also that the death occurred by accidental drowning arising out of and in the scope of his employment as there is a presumption against suicide.

The case of *Gero v. John Hancock Mutual Life Ins. Co.*, supra, also cites the case of *Harvey v. Fidelity & Casualty Co.*, 6 Cir., 1912, 200 F. 925, where a passenger on a steamer on Lake Huron was last seen about 4 o'clock in the afternoon and missed two hours later. A search was made through the boat, and the steamer turned back on its course, but no trace of him was discovered. The shore was four miles distant. There was a stiff breeze and the water was rough. It was said in that case that death by drowning could be proved by circumstantial evidence alone which illustrates the principle that the same evidence was sufficient to warrant both the conclusion that the man was dead and that he died by drowning. Recovery in that case was denied by failure to

bring the action in proper time. In the case of *Brownlee v. Mutual Ben. Health & Acc. Assoc.*, supra, 29 F. 2d at page 76, the Court said: "The evidence presented does not require the basing of an inference upon an inference, but rather it is a case where the same evidence not only supports an inference of death, but also the cause, time and place thereof."

In *Salmon Bay Sand & Gravel Co. v. Marshall*, 9 Cir., 1937, 93 F. 2d 1, the Court approved the awarding of compensation based on a claim for the death of a workman who was in good health, good spirits, and with neither marital nor financial difficulties who disappeared on a scow at sea and who was never heard from. In *Gulf Oil Corporation v. McManigal*, D. C. N. D. W. Va., 1943, 49 F. Supp. 75, the body of a tankerman employed on a barge had never been recovered. The Court held that this fact did not prevent a compensation award where according to inferences from the evidence the tankerman had accidently fallen overboard and drowned while engaged in his work.

See also *Veselsky v. Bankers' Life Ins. Co.*, 248 Ill. App. 176, where the clothes of the insured were found on the beach and his body never found, and no effort to recover the body was made. The man was of good moral character, industrious, sober, and the relationship with his wife was pleasant. In discussing the question of a presumption on a presumption, the Court said at page 183 of 248 Ill. App.: "It is argued that the presumption that the insured was drowned rests upon the presumption that he was swimming or in the water and that one presumption cannot rest upon another. This is not a case of two presumptions. There is simply one general presumption—that he lost his life in the water. *Fanning v. Equitable Life Assur. Soc., of United States*, 264 Pa. 333, 107 A. 715." See also article by Dean Trickett of the Dickinson Law School published in *"The Forum,"* Vol. 10, at page 123, March 1906; *Jones on Evidence in Civil Cases*, 4th Ed., Vol. 1, Section 104; 95 A. L. R. 162.

The appellee, to sustain the granting of its B prayer, relies strongly on the case of *Robertson v. North Ameri-*

*can Refractories Co.,* 169 Md. 187, 181 A. 223, where the deceased man worked at firing a brick kiln and without any one seeing what occurred, was found dead adjacent to the kiln. Burns were found on his forehead, his cheek, and his left hand. He, having died of a heart stroke, it was claimed that the burns preceded the stroke and produced it. This Court held in that case that as there was no testimony that the burns were received before the stroke and that such an accident might have caused the stroke, the testimony was not above speculation and conjecture and was not sufficient to support a verdict, and approved a directed verdict against the claim. We do not feel that that case is in point for the reason that as the body of Krell has not been found after such an extensive search, and as there is direct evidence tending to show that he did not leave by land, it is above speculation and conjecture that if he died, it must have been by drowning, and further, that if death occurred by drowning, it must have been caused by an accident, drowning, within the scope of his employment for his duties carried him during the time before he disappeared in close proximity to the water.

In the case of *Baltimore Towage, etc., Co. v. Shenton,* 175 Md. 30, 199 A. 806, a well-considered opinion by Chief Judge Bond, a truck driver, while waiting on a pier for his truck to be loaded, wavered and fell into the water and was drowned. This Court held in that case that although there was no evidence that the death was caused by an accidental fall into the water, yet as the drowning would not have occurred had the driver not been required by his employment to be on the pier, there was legally sufficient evidence for a finding that the death resulted from an accident arising out of and in the course of his employment, and the trial court was therefore correct in refusing a prayer directing a verdict for the defendant. Likewise, in the case at bar, if death occurred, the fact that the death occurred from drowning on the date claimed is above speculation and conjecture, and as Krell's duties required him to be in the proximity

of the water, it is above speculation and conjecture that the death arose out of an accidental injury, that is drowning, sustained in the course of his employment.

Although certain aspects of this case are novel in Maryland and although the continuance of life is here presumed until the contrary is proved or inferred from the nature and circumstances of the case, this Court is of the opinion, based on the evidence here presented and authorities herein given, that the circumstantial evidence is such as to be above speculation and conjecture and such as to be legally sufficient to support a finding by the jury by inference from undisputed facts produced, if the jury so finds, that this sober, industrious, healthy man with a good disposition, a happy home life, with a wife and children whom he loved, and "fenced in" at the time of his disappearance, died on the date alleged from an accidental drowning arising out of and in the course of his employment, and therefore that the A and B prayers of the defendant should not have been granted. The judgment, therefore, must be reversed and the case remanded for a new trial.

The appellant's sixth exception was to the exclusion of her statement in the claim filed with the State Industrial Accident Commission, that the cause of death was by drowning. This statement might properly have been admitted as a part of the record stating her claim, similar to a declaration, *Moller Motor Car Co. v. Unger,* 166 Md. 198, 203, 170 A. 777, but as the statement had no evidentiary value and could not be used in argument, *Travelers Ins. Co. v. Needle,* 171 Md. 517, 519, 520, 189 A. 216, its exclusion was not reversible error.

*Judgment reversed with costs, and case remanded for a new trial.*