EMMA E. BAUDER v. JOHN L. BLACKISTON.

*Proof of Marriage—Habit and Reputation.*

Marriage may be inferred from general repute, conduct and declarations, even though a religious ceremony is essential to its validity, and even though a qualified and capable witness is within the jurisdiction of the tribunal passing upon the question, or is actually sworn as a witness in the case.        pp. 324-326

Where one asserting a marriage relies upon a particular form or ceremony and fails to prove that, he cannot afterwards rely on general reputation to establish the marriage.        p. 325

On an issue as to the legitimacy of one seeking to caveat his father's will, *held* that the evidence that the parents lived together for a number of years as man and wife, and were so regarded by their families and acquaintances, and as to their declarations that they had been married, was sufficient to justify a finding that they were married, although the mother, while introduced as a witness, was not asked as to the facts of the marriage, and although the father, after their separation, had told a number of persons that he had never been married, and the mother frequently signed papers by the name which she bore before the marriage.                    pp. 326-336

*Decided December 10th, 1925.*

Appeal from the Orphans' Court of Baltimore City.

Caveat by John L. Blackiston to the will of Thomas J. Blackiston, deceased, to which Emily E. Bauder filed an answer, denying the caveator's right to maintain the caveat. From an order in favor of the caveator, said Emily E. Bauder appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Philander B. Briscoe,* with whom were *Burdette B. Webster* and *Briscoe & Jones* on the brief, for the appellant.

*Murray MacNabb,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Thomas J. Blackiston died in Baltimore City, of which he had been a life-long resident, on December 15th, 1924, at or about the age of seventy-five years. He left a paper writing purporting to be his last will and testament, in which he gave his estate to Emily Bauder, the appellant, with whom he had boarded for something over two years immediately prior to his death. To that will, on January 21st, 1925, John L. Blackiston, the appellee, filed a caveat, in which he

represented that he was the son of the decedent, and that he
and his brother Harry Blackiston were his only children
and, with the decedent's wife, Margaret Blackiston, his only
heirs at law.   On February 24th, 1925, Emily Bauder, an-
swering the caveat, denied that the caveator was the legiti-
mate son of the decedent, and denied that Thomas J. Black-
iston was ever married to Margaret Blackiston, the mother
of the caveator.   Testimony in connection with the issue thus
presented was taken in the Orphans' Court of Baltimore
City and, on May 22nd, 1925, that court ordered that the
right of the caveator to maintain his caveat had been estab-
lished, and authorized him to prosecute the caveat and resist
the probate of the supposed will.   From that order this ap-
peal was taken.   The only question which it presents is
whether upon the evidence before it the orphans' court was
legally justified in deciding that the caveator was the legiti-
mate son of the decedent.

Before referring to the evidence bearing upon that ques-
tion, we will advert to the legal principles which determine
its validity, value, and effect.

The precise issue of law made by the conflicting conten-
tions of the parties is whether, where, as in this state, a
religious ceremony is essential to a valid marriage, that fact
may be inferred from habit and repute, where a qualified
and capable witness is within the jurisdiction of the tribunal
passing upon the question.   The general rule, almost univer-
sally recognized in the courts of this country, is that in cases
of this character marriage may be inferred from habit and
repute (*Bishop, Marriage, Divorce and Separation,* pars.
927, 932), whether a religious ceremony is essential to its
validity or not (*Jones v. Jones,* 48 Md. 403; *Fornshill v.
Murray,* 1 Bl. 482), for, as was said in *Jones v. Jones, supra:*
"If parties live together ostensibly as man and wife, demean-
ing themselves towards each other as such, and especially if
they are received into society and treated by their friends
and relations as having and being entitled to that status, the
law will, in favor of morality and decency, presume that they

have been legally married." And while that rule appears to have originally rested upon the principles of necessity and trustworthiness (*Wigmore on Evidence,* par. 1602), it appears to have hardened into a more or less arbitrary formula, which to some extent and in some instances at least dispenses with the requirement of necessity. The necessity which originally formed one of the bases of the rule was the difficulty of proving the fact of marriage through the disqualification, death, or disappearance of witnesses having direct knowledge of such fact, or the absence of any recorded evidence thereof, or the difficulty of securing actual witnesses to a private marriage. *Ibid.* But in its application the rule has been extended to permit proof of marriage by reputation and repute even in cases where the evidence of persons having direct knowledge of the fact is available, as in *Brell v. Brell,* 143 Md. 448, where such evidence was admitted to prove a marriage although the husband testified that it never existed. But in this state that construction of the rule is subject to this qualification, that where the party asserting the validity of the marriage relies upon a particular form or ceremony and fails to prove that, he cannot afterwards rely on general reputation to establish it. *Bowman v. Little,* 101 Md. 294; *Jackson v. Jackson,* 82 Md. 28; *Barnum v. Barnum,* 42 Md. 251. In general, however, the fact of marriage may be inferred from habit and reputation, and "these elements of proof—namely, cohabitation, reputation, declarations, conduct and reception among friends and neighbors as married—are commonly, in a perfect case, found in combination. All the latter ones are shadows attending on cohabitation, and they should be simultaneous therewith." *Bishop on Marriage, Divorce and Separation,* par. 939. But while if an attempt to prove a ceremony at a particular time and place, as in *Barnum v. Barnum, supra,* fails for want of direct proof, that particular ceremony cannot be shown by proof of general reputation, habit or declarations, nevertheless, where there is no such particular specification of former ceremony, time and place by the party asserting the

marriage, the fact that it occurred may be inferred from the habits and declarations of the parties and from general reputation.

There is of course a certain manifest incongruity in proving a marriage by general reputation, conduct and declarations, when the actual parties to it, who must know whether it occurred, are within reach of the court's process, and especially when they are actually sworn as witnesses in the case. But where no particular form, ceremony, time or place is asserted, and where the parties to it are not called, or if called are not examined by either side as to those facts, it cannot be said, in view of the decisions of this court in the two cases last cited, that marriage may not be inferred from satisfactory proof of general repute, conduct and declarations.

It remains for us to consider in the light of these principles the value and the effect of the evidence relating to the issue of fact decided by the lower court.

John W. Teufel, an undertaker, sixty-one years old, testified that he had known the appellee forty-six years, had known his father and mother when they were living together; that they were known in the neighborhood in which they lived as husband and wife, and that he knew them to be living together as husband and wife for about ten years, and that one of their children was born while they lived in his parents' home.

Miss Motsham testified that she had gone with Mrs. Thomas J. Blackiston to visit her husband's parents; that they were respectable and refined people, that she knew that Mr. and Mrs. Thomas J. Blackiston lived together as husband and wife for a number of years, and that when she first knew them she was about six years old and lived on West Baltimore Street two or three doors away from them.

Dr. Haddaway, minister of the Star Methodist Protestant Church, produced and proved a baptismal record showing that a child named John Blackiston, son of Tom and Maggie

Blackiston, born on April 3rd, 1878, was baptised at that church on May 15th, 1878.

Mrs. Gertrude Davis, a sister of Mrs. Blackiston and aunt of the appellee, testified that she had known the decedent all her life, that he and her sister lived together in the community as husband and wife, and were so recognized by his parents, with whom they lived for a while, that they lived together as husband and wife for about fifteen years, that they lived for part of that time with her mother, and that there were two children of the marriage, John and Harry, and that Harry was a soldier stationed at Fort Meyer.

John K. Doenges, a brother of the appellee's mother, testified that he had known Mr. Thomas J. Blackiston about fifty years, that he was present when he and appellee's mother came home and said they were married; that they lived at his home as husband and wife, and that one of the boys was born there, that they lived together and were understood in the community in which they lived to be husband and wife; that the parents of Thomas J. Blackiston were very fine people, and that Thomas J. Blackiston and his wife lived with them for a time, that he was about sixty-two years old, and that he saw Mr. Blackiston about four weeks before he died, that his relations with him were always pleasant; that the decedent was until about fifteen years ago a hard drinker, and that his wife left him on that account, but that he continued to visit her from time to time and was there within a year of his death.

John Blackiston, the appellee, testified that he was born April 3rd, 1878, that the first place he could remember living at was Teufel's, where he, his father, mother and younger brother lived, that from there they moved to the house of his grandmother Doenges, and thence to his grandmother Blackiston's until Teufel's flat was available, that his father and mother lived together about fifteen years and when they separated his mother moved to her mother's home, that his father begged her to come back, but she did not, that he remained on friendly terms with his father and

saw him about two weeks before his death, and called at the place where he died to "see his remains."

Mr. Bradford, outside manager of the Frazee-Potomac Laundry, at one time a clergyman, a nephew of the decedent, testified that he had visited the home of the decedent when he and the mother of the appellee were living together, that they were "assumed" to be husband and wife, that the decedent spoke of his children and appeared to be proud of his boy in the army, and showed him a picture of that son in his uniform; that he spoke of them on every occasion.

Mrs. Straub, sister of appellee's mother, testified that decedent and her sister lived together as husband and wife for about fifteen years, and were reputed to be husband and wife.

Mrs. Blackiston, called by the cavatee, testified that her maiden name was Margaret Doenges, that she was married twice, that her first husband was Nimrod Cromwell Hughes, who died fourteen months after their marriage, when she was about seventeen or eighteen years old, that the child mentioned in the baptismal certificate was her son John, the appellee, that she was living with Mr. Blackiston on April 3rd, 1878, that she signed as "Maggie Hughes" certain receipts for money paid for the support of her son John, that she did that because she was separated from her husband. Upon being further examined as to her reasons for thus signing her name the witness gave this testimony:

"Do you recall that you signed all of these papers which I have shown you, some of which are dated as late as 1887 and 1888, as Maggie Hughes? A. Yes, because I never intended to take his name. I did not think he was worth for me to take his name. Q. What name do you go by now? A. Mrs. Margaret Dora Blackiston. Q. When did you start to assume the name of Mrs. Blackiston, A. Why I always did; only after I went home. I wasn't going to live with him and I told him I wouldn't take his name and he begged me and said, 'Don't do anything like that,' and his mother and the whole family said 'Don't do that, don't do that. * * *

Why then did you sign, in 1888, your name as Maggie Hughes? A. Well I told you that I intended never to go by the name of Blackiston. Q. We have probably shown you twenty or twenty-five papers, extending over a period of several years, every one of which is signed as Maggie Hughes. Can you give an explanation to the court why that is the case? A. I said I took the name of Hughes. * * * Q. I understood that those receipts, practically all of them cover receipts for money paid for the support of John. I ask you why support was paid to John and not to Harry? A. Why, because we were living together then and he half-way supported me. Not wholly. Q. If you were living together, why did you give receipts for the support of a child? A. Well, if you must know, I wasn't living with him. That's why. Q. How do you reconcile that with your statement a while ago that you were living with him? A. Well, we went together when John was fifteen months old. Q. You then started living with him when John was fifteen months old? A. Yes. Q. Where did you live before John was born? A. I lived with my mother. * * * Q. And fifteen months after John was born you went to live with Mr. Blackiston? A. I went to live with Mr. Blackiston's mother and father and then we went to live at Teufel's, because the apartment wasn't ready when we wanted it. His mother said, 'You stay here,' and I could have stayed there forever and ever.' "

And on cross-examination she said: "Q. Did I understand you to say that you separated from Mr. Blackiston and told him you were not going to live with him any more? A. Yes. * * * Q. How many times did you separate from Mr. Blackiston? A. Twice. * * * Q. And during that time you were paid some money for support and you signed the receipts? A. Yes, I intended to go by that name all the time. Q. I understand after you separated from him you decided to take the other name and kept it? A. Yes, because my first husband's people were of the highest standing. Q. How old were you about that time? A. I was nineteen

when John was born. * * * Q. Who gave you the money represented by these receipts? A. Why Tom would bring it in sometimes; sometimes his father."

And upon being recalled she further testified: "Q. Can you say now, after several days' reflection, when you first, the date that you first, assumed the name of Mrs. Blackiston? A. Well, after I was married, I took my husband's name, Mrs. Blackiston, and always went by the name of Mrs. Blackiston and I never knew any other name. Q. I will ask you the question again, Mrs. Blackiston, what was the date that you first took the name of Mrs. Blackiston? I mean the date? A. Well, I can't just exactly tell you the date, because it's been so many years ago. My boy there is forty-seven years old. I can't remember like I used to could. I knew I was his wife. I know that well. * * * Q. Can you give us the year? A. The year what. Q. That you first took the name of Mrs. Blackiston? A. Well, I took it right after I was his wife. (Mr. Briscoe) : I ask that the answer be stricken out. (The Court) : When did you first claim to be his wife, do you know the date? A. Yes, sir; four weeks after we went off and got married."

The witness was subsequently recalled by the appellee and testified that the appellee was the person named in a birth certificate showing the birth of a certain Baby Blackiston on April 3rd, 1878, son of Thomas and Maggie Blackiston, and in the baptismal certificate referred to above, that the Nimrod Cromwell Hughes named in a death certificate offered in evidence showing his death in February, 1876, was her husband.

As against this testimony the appellant offered Mrs. Bauder, legatee under the alleged will and at whose house decedent died. She testified that she knew him slightly for about two years before he came to board with her, that he was "always represented as an old bachelor in the neighborhood, always." She then gave this striking description of an interview which she had with the appellee when he called at her house after the death of the decedent: "During that

period of over two years what times, if any did this lady, Mrs. Blackiston, or this gentleman, Mr. John Blackiston, ever come to your house? A. I never saw them in my life until the son came into my house; Mr. Blackiston died on December 15th. On the 16th, he came to the house and I did not let him in. My daughter let him in. My daughter came up to tell me that the gentleman was in the parlor and I went down to see him. He represented himself to be Mr. Blackiston's son and I listened to his story and I then said to him: 'I'm awfully sorry'; that Mr. Blackiston told me his life's story. He denied ever having a wife. I said, 'You are not Mr. Blackiston's son.' I said, 'I understand your mother never married' and he emphatically said to me, 'My mother was never married; it is a dark secret,' and he said, 'She was a common law wife.' I turned to him and I said, 'For conscience sake keep it a secret until after Mr. Blackiston is buried,' and then I said, 'Come to me and I will talk it over with you.' Q. Was that practically the entire conversation that you had with Mr. Blackiston? A. He said, 'Do I not look like him'? I said, 'Well, Mr. Blackiston was seventy-two years old.' I said, 'Well, I couldn't say you look like Mr. Blackiston, because he was a corpse.' "

Mrs. Saunders, who lived at 923 L Street, N. W., Washington, testified that she was a cousin of the deceased, that she knew Mr. Bradford (who denied knowing her), that she was sixty-five years old and had known decedent all her life, that she had never heard of his being married, and that his "reputation was he was not married," that at the interview between appellee and Mrs. Bauder, she was introduced to him as "Mrs. Saunders from Washington, Mr. Thomas Blackiston's cousin." "He said, 'How do you make it'? I said, 'His father was my father's brother.' He said, 'Well, Mr. Bradford, the nephew, is the nearest of kin.' Q. Who said that? A. Mr. John Blackiston. He said that Mr. Bradford was Mr. Tom Blackiston's nearest of kin and I said, 'Are you any relation to Mr. Blackiston,' and he said, 'No.' "

Mrs. Pullman, Mrs. Bauder's daughter, was also present at the interview, and she gave this version: "I let Mr. John Blackiston in. He told me he was a son of the deceased. I had never knew anything about it, so I told him I would call my mother. My mother came down and my mother told him what had been told her and I heard him tell my mother, Mrs. Bauder, that it was a dark secret; that his mother and Mr. Blackiston had never been married. I then went upstairs and told Mrs. Saunders that the gentleman claimed to be a relative. She came down and I followed them down into the room. The dining room and parlor connect and I heard Mrs. Saunders. He asked Mrs. Saunders was she a relative of Mr. Thomas Blackiston. She told him that she was his own first cousin. He said, 'Well, Mr. Bradford is nearer of kin than you are; he is his nephew.' She said, 'Are you any relation to him'? He said, 'No.' (The Court): He told you he was the son? A. When he came in he told me he was the son of Mr. Thomas Blackiston and then he denied it to the rest. Q. After that he said it was a dark secret? A. Yes, afterward he said it was a dark secret." She also testified that decedent had told her that he was not married and that during the time he lived in the house with her mother he was known as an old bachelor.

Dr. Iglehart, who had known him fifteen or twenty years, knew nothing of his reputation one way or another.

Samuel Leonberger, Walter A. Hopkins, Mrs. Ruth Orndorf, Mrs. Mary Eckman, Harry E. Doron, Mrs. Charles E. Davis, J. A. Roe, George Ernstberger, all testified that they had known the decedent for from four to thirty years, and had never heard of his being married, and that he had told them he was a bachelor.

Charles E. Evans testified that he had searched the marriage license records of Baltimore City from 1876 to and including 1880, and had not been able to discover that any license had been issued to Thomas J. Blackiston.

Mr. George Dobbin Penniman produced certain records of the Baltimore & Ohio Relief Association, which showed

that in his dealings with that organization from 1883 to 1923 the decedent claimed to be unmarried.

This is in substance all the evidence in the case which has any important bearing on the issue of fact which the lower court decided in favor of the appellee, and after a careful consideration of it we feel that we would not be justified in reversing that conclusion. It cannot be said that the evidence is entirely satisfactory, and it is unusual in this respect, that although the caveatee called as her witness Mrs. Blackiston, who of all persons would have been most likely to know the actual facts of her marriage, neither the caveator nor the caveatee asked her a single question about them. That restraint would at least appear to indicate that both sides had some doubt and apprehension as to what her testimony would be, and as to whether there had been a marriage in fact. But as we have already indicated, their failure to examine her on that point, under the circumstances of this case, did not render the other testimony relating to habit, repute, and declarations inadmissible, and we must take the record as we find it.

The evidence submitted on behalf of the caeator was fully as strong as that offered in *Brell v. Brell, supra,* and in some respects stronger, and there was no direct contradiction of it. It showed that for fifteen years, with the exception of two periods of uncertain duration, Thomas J. Blackiston and Margaret Doenges lived together as man and wife, and were so accepted and regarded in the communities in which they lived, that two sons were born to them, of whom the caveator was one, who were acknowledged by the decedent as his children, that they were received by both his family and hers as husband and wife, that they were known as Mr. and Mrs. Blackiston at least for a while, and she testified directly that they had been married. Upon that testimony no court would have been justified in holding that Thomas J. Blackiston was not the legitimate son of the decedent, but for the doubt raised by the failure of the caveator to examine Mrs. Blackiston concerning the fact of her marriage. But in

view of the fact that the orphans' court had an opportunity
of seeing and hearing this witness, who must have been well
advanced in years, and of measuring her capacity to testify,
we are reluctant to disturb their finding for that reason alone.

Coming to the evidence offered by the appellant, it is clear-
ly insufficient to break down the case, such as it was, made
by the appellee. There was no contradiction whatever of the
testimony that during their cohabitation the decedent and
Margaret Doenges were recognized and reputed in the com-
munities in which they dwelt to be husband and wife, and
that they were received as such by the parents of both of
them, and that they actually lived as husband and wife in
the homes of those parents. It is true that a number of wit-
nesses who knew the appellant in the later years of his life,
long after he and his wife had separated, testified that he
was known as an old bachelor, and that he denied that he
was married. But none of those witnesses knew anything of
him when he was living with Maggie Doenges. And since
there can be no reasonable doubt that he did live with her,
the relationship between him and her at that time was the
point in issue, and not what was said of him when he was
living apart from her, by persons who had never known that
he had ever lived with her.

This brings us to the testimony of Mrs. Bauder and her
daughter Mrs. Pullman, concerning the appellee's revela-
tions concerning the "dark secret." This testimony is too
inherently incredible to deserve or receive much considera-
tion. That a man who was neither intoxicated or insane,
and there is nothing to indicate that appellee was either,
would confess to an utter stranger his own illegitimacy and
his mother's shame, at a time when she was going under his
father's name, and when he was claiming to be his legitimate
son, is to say the least improbable. Nor can much import-
ance be attached to the testimony of Mrs. Bauder, Mrs. Saun-
ders, and Mrs. Pullman, that the appellee had said to them
that he was not related to the decedent. Mrs. Pullman and
Mrs. Bauder both testified that he had stated to them that

he was the son of the decedent, and only denied it when Mrs. Saunders, who was introduced as a cousin, appeared on the scene. But it is not apparent from the record why that lady should have so intimidated him, that the mere sight of her was sufficient to make him recant a statement he had made to two witnesses a moment before. Especially in view of the fact that Mr. Bradford, a nephew of the decedent and the only witness whose relationship to him was unquestioned, said that he did not know Mrs. Saunders, and had never heard of her father, said to be Lewis Blackiston, although "he had lived all his days with John Blackiston," his grandfather.

This brings us to the evidence relating to certain receipts which appellee's mother signed as "Margaret Hughes." These receipts, twenty-two in number, were given between June 6th, 1885, and December 5th, 1887, for amounts of from ninety cents to fifteen dollars and signed "Mrs. Hughes," "Mrs. Maggie D. Hughes," "Maggie Hughes," "Maggie D. Hughes," "Mrs M. D. Hughes," and on the last of them was written: "Tom, I would like to see you tonight at 11 o'clock. I have got something for you. Let me know if you will be on hand. Send me word." The testimony of Mrs. Blackiston as to why she signed these receipts as "Mrs. Hughes" at a time when she was married to Blackiston, as indeed was all her testimony, was obscure, confused, and contradictory, but so far as anything definite can be gathered from it, her reason was that when she so signed her name she was separated from her husband, and that she separated from him twice during the first fifteen years of their married life, and before their final separation, because by his dissipated and dissolute habits he had disgraced her. It is impossible for us to say that the fact that Mrs. Blackiston signed the receipts as "Mrs. Hughes" is sufficient in itself to overcome the presumption raised by other testimony in the case, that she was at the time Blackiston's wife. Her explanation is not wholly unreasonable or unusual, and while her testimony was confused and obscure, it must be remem-

bered that she was speaking of events which had occurred nearly forty years ago. Under such circumstances we are unwilling to overrule the conclusion of the judges who tried the case, and who had, as we have stated, an opportunity of observing her apparent mental and physical condition.

There were offered in evidence and admitted over objection certain papers purporting to be birth and death certificates from the records of the health department of Baltimore City. These papers were not properly proved and should have been excluded, but as the facts shown in them were in substance proved without objection or contradiction by other evidence, the error in admitting them was not reversible.

Objection was also made to a baptismal certificate offered to show the baptism of the appellee, but in our opinion this document was properly proved and relevant.

It follows from what we have said that in our opinion there was no reversible error involved in the order from which this appeal was taken, and it will therefore be affirmed.

Objection was also made that the record in this case is unduly prolix, but we do not think that it is open to that criticism. It contains nothing but the pleadings and the evidence submitted to the lower court, and it was necessary that we have so much before us to consider the case at all.

*Order affirmed.*