MATILDA I. SCHMEIZL *v.* JOSEPH SCHMEIZL

[No. 33, January Term, 1945.]

*Decided April 12, 1945.*

586

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and
MARKELL, JJ.

*Harry Yaffe,* with whom was *Anthony S. Frederico,*
on the brief, for the appellant.

*Charles D. Harris,* with whom were *France, Rouzer &
Lentz,* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from rulings at the trial of an issue
sent from the Orphans' Court.

Frederick Schmeizl died in Baltimore on December 27,
1943, intestate, without issue. Letters of administration
were granted to his brother, Joseph Schmeizl (the ap-
pellee, defendant), on January 15, 1944. The issue tried
was, Is Matilda I. Schmeizl (the appellant, plaintiff) the
widow of the decedent? The jury answered, "No."

On August 8, 1911, Frederick Schmeizl (the decedent)
and Matilda I. Duerbeck (the appellant), both of Balti-
more, were married at Baltimore by the Rev. Theo. A.
Mead. The license was issued on August 7th, the mar-
riage certificate filed on August 9th. Neither had been
married before. He was 21, she was 19. She and the ad-
ministrator both testified that the decedent (so far as
they know) never got a divorce. She testifies that she
never got a divorce and at the time of his death was still
married.

On cross-examination she testified that: In Septem-
ber, 1911, a daughter (who did not survive the decedent)
was born. On August 8, 1930, she left her husband and
went to California. About two weeks later she was

joined there by Bert Phillips, a man she and her husband knew in Baltimore. Since 1930 she has lived in California continuously. She considers California her permanent address. She is known there as Mrs. Bert Phillips. Her ration books have been issued to her in that name. She has registered as a voter in California under the name Phillips, but not this time (1944). She lived in the same house with Phillips, first at Los Angeles, now at Santa Rosa, where she has a little chicken ranch that he manages for her; he lives forty miles from her, but he comes back and forth.

The administrator testified that: On August 8, 1930, the nineteenth wedding anniversary, "they were going to have a little party." That is when the wife left with Phillips. They got in a taxicab and left a note that they were going to give the decedent "a dose of his own medicine." The next time the administrator saw her was in the Orphans' Court in January, 1944. Some time in March or the first part of April, before she left to go back to California, she went to his house and had a conversation with him. While they were talking, she opened her pocketbook, and he saw her ration book in the name Phillips. "I said to her, Are you married to Phillips? She said, Why, yes. I said to her, Well, how about a divorce? She says then, Well, I got to be married by a preacher out there without getting a license. A marriage license. And also it wouldn't be put upon the court record. Then she said, I am married to him. * * * She told me that she was married by a preacher in California, * * *. That is just the way that I remember it. I didn't ask her the second time for she said that they did not get any license, for the law did not require that they be married by a preacher out there and they didn't have any court record of it. * * *

"[Q.] Did you ask her whether or not, * * *, she did not consider herself married at that time or whether she considered herself as divorced at that time from your brother? A. Well, you see, she thought that it didn't amount to nothing. She could come back at any time

she wanted to if something happened, and claim her widow's share. * * *

"Q. * * * Did she say that she was married or divorced * * *? A. Well, she says that she was divorced and she says she was married."

On cross-examination he testified:

"Q. * * * When [she] * * * said to you that she was married by a minister in California did you then ask her for the name of that minister? A. Well, she mentioned some name but I can't remember all those names. I can't remember all of the names. * * * She never told me that she had got a divorce, * * *.

"Q. * * * did you ask her how she * * * could * * * have been married by a minister in California on the face of her statement to you that she had never gotten a divorce from your brother * * *? A. Well, she said something about that they did not keep any record of it and didn't have no marriage license so it didn't make any difference.

"Q. In other words, * * * [she] said that she had never gotten a divorce, is that correct? A. I never asked her that and she never said nothing. That is what she told me though. * * *

"Q. * * * What did she tell you? A. She didn't ever get a divorce and just said that she got married and they didn't need no marriage license and didn't keep no record outside of the preacher's. They didn't have to go to court nowhere. That is all we discussed about it.

"Q. Well, after she * * * said to you that she was married to someone in California, did you ask her * * * how she expected to share in the estate if she was married to someone in California, did you ask * * * how she expected to share in the estate if she was married to somebody else? Did you ever ask her any question of that kind * * *? A. She said that she didn't think it was any difference for it was no record kept of it. She said, I don't think it makes any difference. But I didn't ask her that."

Before the administrator testified, the wife had testified on cross-examination that: She received a letter from an attorney saying that the decedent had died. She was here during February and March. She remembers the hearings in the Orphans' Court at that time. While she was here, she went to the administrator's home and talked with him. She didn't talk with him about her marriage to his brother. "I just told him I was not divorced, that is all. * * * I have been here twice in this year [1944], but the last time I was here I knew that he was the administrator and I wanted to get it all straightened out. I didn't want to keep on coming back and forth all the time so much for I have to live in California on account of my health."

In the administrator's testimony his statement, "she says that she was divorced," is in effect contrary to his previous testimony and is flatly contradicted on his cross-examination. This statement has no probative force or evidential value. *United States Fidelity & Guaranty Co. v. Continental Baking Company*, 172 Md. 24, 33, 190 A. 768; *Slacum v. Jolly*, 153 Md. 343, 351, 138 A. 244.

The administrator offered in evidence Section 79 of the California Civil Code: "Sec. 79. When unmarried persons, not minors, have been living together as man and wife, they may, without a license, be married by any clergyman. A certificate of such marriage must, by the clergyman, be made and delivered to the parties, and recorded upon the records of the church of which the clergyman is a representative. No other record need be made." [Added by Code Amendments, 1877-78, p. 75.]

The plaintiff (the wife) offered a prayer for a directed verdict, an answer "Yes," on the ground that there is no evidence legally sufficient to prove that she was not the decedent's widow. She excepted to the refusal of this prayer and, on the same ground, to the charge to the jury. She filed a "motion for judgment n. o. v.," viz., a motion that the "court enter a verdict for the plaintiff * * * notwithstanding the verdict of the jury." The motion was overruled.

The appellee (the administrator) contends that: there is evidence legally sufficient to show that during the decedent's life his wife and Phillips were married by a clergyman in California; by reason of the presumption of marriage and the presumption of innocence the California marriage must be presumed to be valid; consequently, the wife must be "presumed" to have got a divorce from the decedent; by these presumptions and inferences the presumption of continuance of the decedent's marriage is overcome.

Aside from the doctrine (which Wigmore says is fallacious) that the law will not permit an "inference upon an inference" (*Krell v. Maryland Drydock Co.*, 184 Md. 428, 41 A. 2d 502, 508, decided March 2, 1945), the question in a particular case is whether the evidence is legally sufficient to support one or more particular inferences.

Concerning the presumption of marriage and legitimacy, the statement most quoted in later American cases, and also a concise statement of the doctrine of some leading British cases, are contained in the opinion of the New York Court of Appeals in *Hynes v. McDermott*, 1883, 91 N. Y. 451, 459.

"The presumption of marriage, from cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. *The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy.* Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In *Morris v. Davies* (5 Cl. & Fin. 163) Lord Lyndhurst, speaking of this presumption, says: 'The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.' In *Piers v. Piers* (2 H. L. Cas. 331) Lord Campbell said, that the presumption could be negatived only 'by disproving every reasonable possibility,' and Lord Brougham, in the same

case, approved the general doctrine stated by Lord Lyndhurst, in *Morris v. Davies,* and said that the presumption could be dispelled only by evidence which was 'clear, distinct and satisfactory.' " (Italics supplied). In *Hynes v. McDermott* no "presumption of divorce" was involved.

In both English and American cases the presumption of marriage is closely related to the presumption of legitimacy. In *Morris v. Davies* the presumption referred to by Lord Lyndhurst (5 Cl. and Fin. 265) was the presumption of legitimacy of a child born during marriage of the mother. In *Piers v. Piers,* the presumption discussed was the presumption of marriage—and consequent legitimacy of issue. Lord Chancellor Cottenham (like Lord Brougham), however, adopted the language of Lord Lyndhurst, saying: "It is not precisely the same presumption as exists in the present case; but the principle is strictly applicable to the presumption which we are considering." 2 H. L. C. 362. The sentence in *Hynes v. McDermott,* italicized above, has been quoted, directly or indirectly, in many American cases, including *Bowman v. Little,* 101 Md. 273, 288, 61 A. 223, 657, 1084; and *Schaffer v. Richardson's Estate,* 125 Md. 88, 92, 93 A. 391. In *Bowman v. Little,* it was indicated that the legal sufficiency of evidence in a particular case may depend upon whether or not the presumption of marriage is supported by the presumption of legitimacy. 101 Md. 314, 315, 61 A. 223, 657, 1084. *Cf. Stevens v. Stevens,* 56 N. J. Eq. 488, 496-499, 38 A. 460, cited in *Schaffer v. Richardson's Estate, supra.*

The question of marriage *vel non* is a question of fact. The presumptions of marriage and legitimacy, of innocence, and of continuance of a marriage are presumptions of law (what Wigmore calls real presumptions), which affect, and may shift, the burden of proof and may affect the legal sufficiency of evidence. The so-called "presumption of divorce" (which seems to be unknown in England) is an application of conflicting, or (as Wigmore might say) shifting, presumptions to particular facts (which could not occur in a country with only one

divorce court). The ultimate questions of law and fact are whether the evidence, viewed in the light of all applicable presumptions, is sufficient in law and in fact to support the necessary inferences.

In the instant case the only evidence of the alleged California marriage is the administrator's testimony that when the wife had come from California to Baltimore to assert her rights as widow, she told him she had never got a divorce but had been married to Phillips by a clergyman in California. The date of the marriage and the place in California are not mentioned; the clergyman's name he does not remember. The weight and credibility of this testimony (*cf. Bauder v. Blackiston,* 149 Md. 322, 334, 131 A. 454) would be matters for the jury. But what inference could rationally be drawn from the wife's alleged statement depends largely upon the inherent nature of the statement. The administrator contends that from the wife's statement that she had *not* got a divorce but had married Phillips the jury might infer that she *had* got a divorce.

On a question of marriage and legitimacy *vel non* even hearsay admissions and declarations of the parties to the alleged marriage are admissible. *Craufurd v. Blackburn,* 17 Md. 49, 56, 77 Am. Dec. 323; *Brell v. Brell,* 143 Md. 443, 448, 122 A. 635. A statement by a deceased mother that she had been married may be sufficient to prove the marriage and the legitimacy of her child. *Washington B. & A. R. Co. v. State,* 136 Md. 103, 119, 111 A. 164. It does not necessarily follow that such testimony would be sufficient to overcome the presumption of continuance of another marriage.

"One of the questions decided by the Supreme Court in the case of *Gaines v. Relf,* 12 How. 472 [13 L. Ed. 1071], was that an actual ceremonial marriage could not be made void by the mere confession or declaration of one of the parties to it, that he had another wife living at the time; and in disposing of this point the Court said: 'The great basis of human society throughout the civilized world, is founded on marriages and legit-

imate offspring; and to hold that either of the parties could by a mere declaration establish the fact that a marriage was void would be an alarming doctrine.'" *Jones v. Jones,* 48 Md. 391, 402. "The great basis of human society throughout the civilized world, is founded on marriages and legitimate offspring; and where an existing marriage is proved, it is not to be exposed to the danger of being set aside by any species of collusion, or by the mere declarations of either of the parties, and should only be brought in question upon the most undisputed proofs. *Shelford on Marriage and Divorce,* 573; *Fornshill v. Murray,* 1 Bland [479], 481 [18 Am. Dec. 344]; *Piers v. Piers,* 2 H. L. 331; *Gaines v. Relf,* 12 How. 472 [13 L. Ed. 1071]. * * * The appellee denies that she ever made such admissions or confessions, but assuming that she did, we must apply to them, and to all testimony of like character, what was said by the Supreme Court in *Gaines v. Relf,* 15 Pet. 9 [10 L. Ed. 642; 12 How. 472, 534, 13 L. Ed. 1071], that it would be an alarming doctrine to hold that an actual ceremonial marriage could be made void by the mere confession or declaration of one of the parties to it that he had another wife living at the time." *Le Brun v. Le Brun,* 55 Md. 496, 503, 506. In the cases quoted the admissions or declarations related to alleged prior marriages, but the principle is more broadly applicable. A proved marriage is not lightly to be set aside in favor of another marriage, prior or subsequent. *Fornshill v. Murray,* 1 Bland 479, 481, 18 Am. Dec. 344, cited in *Le Brun v. Le Brun, supra.* In *Wiseman v. Wiseman,* 89 Ind. 479, 483, the court said: "The court instructed the jury that 'the mere admission or oral statements of a husband or wife, that he or she was or had been divorced, would not be sufficient of itself to establish the fact that the marriage relations had been dissolved'; also, that 'no length of separation of husband and wife will create any presumption of itself that the parties are divorced.' No argument is submitted against the correctness of these instructions and, as applicable to the facts of this case, we see no objection to either one of them."

The California marriage lacks the usual evidential support of either a ceremonial marriage or a so-called "common law" marriage. A ceremonial marriage (aside from any religious significance) usually is public, either through performance of the ceremony in a church after publication of banns or through requirement of a license. In England the offense of "clandestine marriage" was a felony on the part of the clergyman who performed the ceremony. 4 *Blackstone's Commentaries,* 162-163. Any secret marriage, not followed by public matrimonial cohabitation and public recognition, invites suspicion, whether a "common law" marriage (*State of Maryland v. Baldwin,* 112 U. S. 490, 495, 28 L. Ed. 822) or a ceremonial marriage (*Brooke v. Brooke,* 60 Md. 524, 535). In *Bowman v. Little,* supra, this court applied a very strict measure of proof of a secret marriage. The California statute permits secret marriage by persons engaged in illicit cohabitation, to enable them to legalize their relations without publishing their guilt. The relations between the wife and Phillips were illicit. There is no evidence of *matrimonial* cohabitation or repute. Their use of his name was a "blind to screen their illicit conduct." *Redgrave v. Redgrave,* 38 Md. 93, 102. Usually such blinds are sufficient for tradesman but are transparent to anyone who chooses to look through them.

The administrator, by his own testimony and by cross-examination of the wife, has rebutted any presumption of innocence. She was forced to admit that she and the decedent had passed the state of innocence before they were married. She openly deserted him to live with Phillips. She had no ground for divorce. It can not be assumed, in order to exonerate her from bigamy, that she is guilty of perjury both in obtaining a fraudulent divorce (*In re Estate of Colton,* 129 Iowa 542, 548, 549, 105 N. W. 1008 cited in *Schaffer v. Richardson,* supra, 125 Md. 93, 93 A. 391, L. R. A. 1915 E, 186; *Cole v. Cole,* 153 Ill. 585, 586-588, 38 N. E. 703) and in prosecuting a fraudulent claim as widow. "Where there are conflicting presumptions of unequal weight,—as that of the continu-

ance of life and that of innocence of crime,—the stronger will prevail. *The King v. Twyning,* 2 B. & A. 386. But in this case, as the conflicting presumptions are equal, and each involves the commission of a crime, we are of opinion that they neutralize each other and no effect should be given to either." *Palmer v. Palmer,* 162 N. Y. 130, 133, 56 N. E. 501, 502. In the instant case the wife's testimony that she never got a divorce is uncontradicted; moreover, she and the administrator both testify that she told him so.

In *Bowman v. Little, supra,* the trial court instructed the jury that a divorce from a former wife will, in the absence of other evidence, be presumed from proof of the husband's second marriage. 101 Md. 310, 61 A. 661. This court affirmed the judgment on the ground that there was no evidence legally sufficient to prove the prior marriage. 101 Md. 286, 287, 61 A. 224, 225. The court quoted *King v. Inhabitants of Twyning,* 2 Bar. & Ald., 386, in which the presumption of innocence was held to warrant a presumption—or inference—of death of a first husband who had been last heard of a year before his wife's second marriage. This court by Chief Judge McSherry, and also Judge Pearce in his dissenting opinion, withheld approval of the doctrine of "presumption of a divorce." 101 Md. 297, 310, 319-320, 61 A. 661, 1087, 1088.

In *Schaffer v. Richardson, supra,* a marriage had been celebrated according to the ceremonies of the Roman Catholic Church in Honolulu on September 14, 1855. The husband and wife lived together in Honolulu until his death in 1912. He left nine children by this marriage, whose ages (in 1914) ranged from 58 to 30 years. In 1848 he had married another woman in Baltimore. They had one child, a daughter. He was a ship carpenter, and was accustomed to be away from home for long periods. In 1849 he left Baltimore and went to California. The wife went to Virginia to live before the Civil War, and in 1866 procured a divorce there. He was last seen by the daughter in 1854, when she was five years old.

After stating the facts, this court said: "\* \* \* the question is: Are they sufficient in law to show the validity of the second marriage? This precise question has not been decided by this court, and it cannot be denied that there is some conflict upon it in the decided cases. It would be an interminable, as well as a hopeless task, to discuss all the cases upon the subject, or to attempt to reconcile or distinguish them." 125 Md. 91, 93 A. 392.

The court held that: the facts were sufficient to show the validity of the second marriage; there is "no imperative rule of law" which required it to hold, under the facts, that the prior marriage was subsisting at the time of the second; "when a marriage has been solemnized according to the forms of law, every presumption will be indulged in favor of its validity, or, as stated in *Bowman v. Little,* 101 Md. 273, 61 A. 223, 657, 1084, \* \* \* 'the law favors morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy.'

"The tendency of the courts is to hold the second marriage valid, especially if there is issue which may be bastardized by a contrary holding, and if the marriage has not been questioned for many years its validity will not be overcome by the mere proof of a prior marriage. In such case the presumption in favor of innocence, morality, and legitimacy will prevail over the presumption of the continuance of the former marriage, and it will be presumed that the first marriage was not binding at the time of the second.

\*    \*    \*    \*    \*    \*

"Proof of subsequent marriage alone makes out a prima facie case as to its validity. To overcome this prima facie case, proof of a former marriage is required, and also evidence from which it may be concluded that it has not been dissolved by death or divorce." 125 Md. 92, 93, 93 A. 392.

In the instant case there is no question of legitimacy; no evidence of a second marriage except an alleged admission of a bigamous marriage; no evidence of innocence or morality, but open immorality and concubinage

and uncontradicted evidence that the first marriage had *not* been terminated by divorce.

Thirty years after *Schaffer v. Richardson*, it would indeed be "an interminable, as well as a hopeless task" to discusss, or attempt to reconcile, all cases on this subject in other jurisdictions. See notes, 34 A. L. R. 464, 77 A. L. R. 729. Conflict is found principally in weighing facts and determining the legal sufficiency of evidence, i. e., in the application, more than in the statement, of principles involved. If a "presumption of divorce" is applied blindly without due regard to the facts of the particular case, the divorce becomes a fiction, and the presumption a "conclusive presumption," i. e., a rule of substantive law by which a bigamous marriage supplants a lawful marriage. *Cf. Mitchell v. Frederick*, 166 Md. 42, 46, 170 A. 733.

In the instance case we find no evidence legally sufficient to show that the decedent's marriage was ever terminated by divorce. The wife's motion for a directed verdict should have been granted; likewise her "motion for a judgment *n. o. v.*"

The Trial Rules, Part Three, III of the General Rules of Practice and Procedure, are applicable not only in an ordinary action at law but (as far as may be) in any other proceeding at law, *e. g.*, a workmen's compensation appeal (Rule 9, Trial by the Court, *Clauss v. Board of Education*, 181 Md. 513, 525, 30 A. 2d 779; *Bank v. Meyers & Co.*, 182 Md. 556, 560, 35 A. 2d 110; Rule 8, Judgment *n. o. v. Albright v. Pennsylvania R. R. Co.*, 183 Md. 421, 37 A. 2d 870, 877) ; or issues from the Orphans' Court. Rule 4, Directed Verdict and (by reference to Rule 4) Rule 8, Judgment *n. o. v.*, are in terms applicable in "any proceeding tried by jury." This court has long exercised power to enter judgments, upon reversal of a judgment on the verdict of a jury, without a new trial when a new trial "would be idle and nugatory." *Baltimore & Havre de Grace Turnpike Co. v. Barnes*, 1823, 6 Har. & J. 57, 61; *State v. Green*, 1832, 4 Gill & J. 381, 384, 385; *Berry v. Harper*, 1832, 4 Gill & J. 467, 470;

*Stockton v. Frey,* 1846, 4 Gill 406, 424, 45 Am. Dec. 138; Code, 1939, Art. 5, Sec. 17. Rule 8 introduces no new principle, but merely confers on the trial court this same power, for the same purpose of avoiding a "futile and nugatory" new trial. See Explanatory Notes, Rule 8, by the Reporter, Mr. Robert R. Bowie. The word "judgment" in Rule 8 has no narrow technical meaning; it includes a "decision" or "determination," on issues from the Orphans' Court or in any other proceeding at law, corresponding to a judgment in an ordinary action at law. Cf. Code, Art. 5, Secs. 7, 6. In the Criminal Appeals Act, 18 U. S. C. A., Sec. 682, the words "decision or judgment" "are not intended to describe two judicial acts, but a single act described in alternative phrases." "The judgment of a court is the judicial determination or sentence of the court upon a matter within its jurisdiction." *United States v. Hark,* 320 U. S. 531, 533, 534, 88 L. Ed. 290.

For the purposes of Rule 8 there is no material difference between the decision or determination of a court of law on issues from the Orphans' Court and an ordinary judgment at law or a judgment on a workmen's compensation appeal. Under the Act of 1777, Ch. 8, the Orphans' Court could summon a jury for the trial of a plenary proceeding; under the Act of 1798 (Subch. 8, Sec. 20; Subch. 15, Secs. 16, 17; Code, 1939, Art. 93, Secs. 235, 264, 265), in a plenary proceeding, the Orphans' Court sends issues to a court of law for trial. Judgment in the plenary proceeding is entered by the Orphans' Court, but the determination of the court of law on issues is final and is binding on the Orphans' Court. *Pegg v. Warford,* 4 Md. 385, 392-396. The court of law has the same powers, with respect to the jury and the verdict, as in an ordinary action, including "power to direct the jury and grant a new trial." Art. 93, Sec. 235. A jury may be waived. *Houston v. Wilcox,* 121 Md. 91, 100, 88 A. 32. This court may reverse a determination on issues "without a new trial" (*Johnston v. Schmidt,* 158 Md. 555, 574, 149 A. 283, 290) and in so doing may

authorize the lower court to "direct a finding of the issues in conformity with this opinion and certify such finding" to the Orphans' Court. *Smith v. Biggs,* 171 Md. 528, 535, 536, 189 A. 256, 260.

The administrator urges that it would be against public policy to permit the wife to share in the decedent's estate. Her misconduct (reprehensible as it was) was not hidden from the decedent. For fourteen years he had ground for divorce. Why he did not get a divorce does not appear. If he did not wish her to have a widow's share of his estate, he apparently could have prevented her from becoming his widow.

The question now before the court is not a question of distribution or of forfeiture but a question of fact, Did the decedent's wife become his widow? If his widow has forfeited a widow's rights, that question may be raised in the Orphans' Court. *Price v. Hitaffer,* 164 Md. 505, 165 A. 470. Under the Statute of 13 Edward I, Chapter 34 (if in force in Maryland) a wife by elopement and adultery forfeits dower, 2 *Blackstone's Commentaries* 130; *Poe on Pleadings,* Sec. 277. Under the Act of 1809, Ch. 138, Sec. 7 (Code, 1939, Art. 27, Sec. 19), both dower and a wife's distributive share of personal estate are forfeited on conviction of bigamy. If the "public policy" of these statutes is to be expanded, this must be done by the Legislature. Whether morals would be improved, or perjury increased, by making next of kin avengers of a decedent's marital wrongs, is not for the court to determine.

The record will be remanded in order that the Superior Court may enter a finding of the issue, by an answer "Yes," and certify this finding, with the costs, to the Orphans' Court.

*Rulings reversed, and cause remanded.*