## DUKES ET AL. *v.* EASTERN TAR PRODUCTS CORPORATION ET AL.

[No. 138, October Term, 1950.]

*Decided April 13, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Walter V. Harrison* and *Amos I. Meyers* for appellants.

*George W. Baker, Jr.,* with whom were *John G. Rouse, Jr.,* and *Rouse & Morton* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

Rubin Dukes met his death on June 28, 1945 by accidental means arising out of and in the course of his employment by the Eastern Tar Products Company. Hattie Camp Dukes, claiming to be his widow, filed a claim with the State Industrial Accident Commission on

behalf of herself and three minor children. On June 20, 1946 the claim was disallowed, on the ground "that Hattie Dukes was not the lawful widow of Rubin Dukes, deceased, and that the said infant children, hereinbefore mentioned, were not dependent upon, nor members of the household of said Rubin Dukes, deceased, at the time of his accidental injury and death * * *." On appeal to the Superior Court of Baltimore City, the case was tried on the record on March 13, 1950, before the court without a jury, resulting in an affirmance. From a judgment for the employer and insurer the case comes here.

It was shown that Hattie Dukes and the decedent were married by a Notary Public at Spartansburg, South Carolina, on January 13, 1934, and had three children, born respectively on May 26, 1934, March 1, 1936 and October 4, 1937. The first two children were born in South Carolina, the last in Baltimore. Dukes came to Baltimore in January, 1937, and Hattie Dukes followed him here in May, but she returned to South Carolina about a year later. She testified that she visited him in Baltimore three or four times, for periods of from a few weeks to six months. Dukes had not been back to South Carolina since 1937, but according to the claimant, he regularly sent her $20 to $25 a week. The Commission found his average weekly wage was $52.50.

It was shown that Hattie Camp was married to one Ralph Young by a Notary Public at Gaffney, South Carolina, on December 29, 1929, and they lived in Gaffney. She had a son by him born on May 27, 1931. She testified that she never obtained a divorce from Young; "they don't give a divorce in Gaffney"; "I didn't sign any papers. I don't guess he got divorced"; "the last I heard from him he was living in New York"; she did not receive any money from Young for the support of the child. The child was raised by her father. At the first hearing before the Commission she admitted the marriage to Young. Asked if he were still living, she replied: "Yes, sir, I guess he is". She could not fix the time when she

last saw him, but thought it was about six years before the date of the hearing. At a later hearing, she swore that she had never been married to Young, that she just lived with him. She also swore she had not "seen him in a year, probably more, before me and Rubin was married." She heard he had gone to New York from a mutual friend.

The marriage to Young was proved by the production of certified copies of the marriage license and certificate of marriage. No question is raised as to the authenticity of these records. The marriage to Dukes was proved in the same manner. Hattie's signature appears on both certificates; the signature of Nannie Camp also appears as a witness to the first marriage. In the face of the documentary evidence, the statement of the claimant that she was never married to Young can be given no credence. She did not deny that he was still alive. The appellant contends, however, that proof of the second marriage and birth of issue raised a presumption of divorce.

That such a presumption exists has been recognized and given effect in Maryland. It was discussed in *Bowman v. Little*, 101 Md. 273, 61 A. 223, 657, 1084, although the decision turned upon a question of identity. The appellant strongly relies upon *Schaffer v. Richardson's Estate*, 125 Md. 88, 92, 93 A. 391, 392, L. R. A. 1915E, 186, where it was said: "the presumption in favor of innocence, morality and legitimacy will prevail over the presumption of the continuance of the former marriage, and it will be presumed that the first marriage was not binding at the time of the second. * * * "Proof of subsequent marriage alone makes out a *prima facie* case as to its validity. To overcome this *prima facie* case, proof of a former marriage is required and also evidence from which it may be concluded that it has not been dissolved by death or divorce". The presumption was given full effect under the facts of that case, and the court found it unnecessary to consider evidence that the decedent had actually been divorced prior to the

second marriage. However, it was recognized that the presumption is not conclusive. In *Schmeizl v. Schmeizl,* 184 Md. 584, 597, 42 A. 2d 106, 112, after a full review of the authorities, it was said: "if a 'presumption of divorce' is applied blindly without due regard to the facts of the particular case, the divorce becomes a fiction, and the presumption a 'conclusive presumption' i. e., a rule of substantive law by which a bigamous marriage supplants a lawful marriage. *Cf. Mitchell v. Frederick,* 166 Md. 42, 46, 170 A. 733, 92 A. L. R. 1412". We held there was no legally sufficient evidence of a divorce, and sustained a claim based on the first marriage.

In the instant case the claimant frankly admitted that she had never obtained a divorce from Young, and her entry into a second marriage in another part of the State is hardly consistent with innocence. We find no room for an inference that Young obtained a divorce from her. There is no evidence that Young had left South Carolina at the time she was married to Dukes, and she testified she never received any notice of proceedings elsewhere. At the time of the second marriage divorce was prohibited by the Constitution of South Carolina (Article 17, Section 3), and the South Carolina courts declined to recognize foreign divorces, except to the extent required by the federal constitution. *Scheper v. Scheper,* 125 S. C. 89; 118 S. E. 178. Cf. *Hallums v. Hallums,* 74 S. C. 407; 54 S. E. 613. It is unlikely that South Carolina would have recognized an *ex parte* dissolution of the first marriage, of which she had no notice, *Epstein v. Epstein,* 193 Md. 164, 171, 66 A. 2d 381, 383, or that it would have been required to do so. *Rice v. Rice,* 336 U. S. 674, 69 S. Ct. 751, 93 L. Ed. 957. In considering the validity of the second marriage, the law of South Carolina would apply. *Bannister v. Bannister,* 181 Md. 177, 29 A. 2d 287; Restatement, Conflict of Laws, § 121; 2 Beale, Conflict of Laws, § 121.2, p. 670.

Under the facts of the instant case, we think the presumption of divorce was rebutted. Cf. *De Ra Luis v. Carter Carburetor Co.,* Mo. App., 94 S. W. 2d 1130 and

*Industrial Commission v. Dell,* 104 Ohio St. 389, 135 N. E. 669, 34 A. L. R. 422. Under the applicable section of the Maryland Compensation law, Section 48, Article 101 of the Code of 1939, the claimant cannot recover on the basis of mere dependency, but only as the lawful widow of Dukes. *Scott v. Independent Ice Co.,* 135 Md. 343, 109 A. 117. Our recent decision in *Kendall v. Housing Authority,* 196 Md. 370, 76 A. 2d 767, was based upon the 1947 amendment of the law, Code Supp. 1947, art. 101, § 35.

The claim of the three children stands on a somewhat different footing. Under Section 48, Article 101 of the Code of 1939, it was provided that "the following persons shall be presumed to be wholly dependent for support upon a deceased employee: * * * a child or children under the age of sixteen years * * * living with or dependent upon the parent at the time of the injury or death". Under Section 80 (as amended subsequent to the decision in *Scott v. Independent Ice Co., supra*), it was provided: "(10) The term 'child' and 'children' shall include posthumous children and adopted children, whether members of the deceased employee's household at the time of his accident or death or not, and shall also include stepchildren, illegitimate children and other children, if such step-children, illegitimate children and other children were members of the household of the decedent at the time of the accident or death and had received contributions toward their support from such deceased employee during any part of the six months immediately preceding the accident or death". To bring themselves within the Statute, the three children of Dukes by the void marriage must therefore show (1) that they were members of his household at the time of his death and (2) received contributions toward their support from him within six months prior to his death. Cf. *Community Baking Co. v. Reissig,* 164 Md. 17, 23, 164 A. 176.

Hattie Dukes testified that the decedent came to Baltimore in 1937 and never was in South Carolina thereafter.

She returned to Gaffney in the spring of 1938 to live with her parents, taking the children with her. When she returned to Baltimore, on three or four occasions, she and Dukes stayed at her sister's house. She testified that "on the day before I got the telegram that he was dead he sent the oldest girl some money and said that he would be home the second week in August". She did not produce the letter. She testified it came from 2331 Pennsylvania Avenue. At the time of his death Dukes was living at 1548 Pennsylvania Avenue, and had been for over a year prior to his death. Mrs. Amelia Johnson testified she lived there too, but not in the same room. She denied that she lived with Rubin as man and wife, but admitted they were "very close friends" and he gave her "a piece of money now and then", "about every month, or once or twice a month". She was employed at a lunch room, and he did not support her. They both paid for their rooms to the "lady that rents the apartment", who occupied the front room. Rubin told her he had a wife and children, "but they were not together". She did not "know of him sending any money" to them.

Hattie Dukes testified that she was not working in Gaffney, just "taking care of the children"; that she had "a house of my own now", where she lived with the children, for which she paid two dollars a week. She got $20 to $25 a week from Rubin. Samuel Montgomery, brother-in-law of Hattie, testified he knew Rubin Dukes, that he often talked to him about his family, that Rubin told him he intended to go back to South Carolina, that Rubin sent money to them. On cross examination he admitted he did not know where Rubin lived, that he had never seen Hattie since she went back to South Carolina with the children in 1938. Joseph Green, who shared an apartment with Dukes at one time, testified that Dukes was sending money to his family in South Carolina at that time.

We think the testimony falls short of establishing that the three children were members of the household of their father at the time of his death. It has been held

that temporary absence from an established household on business, even for protracted periods, does not amount to a breaking up of the household or prevent recovery. *Harlan v. Industrial Accident Commission,* 194 Cal. 352, 228 P. 654. Likewise recovery has been allowed where the father lived in a hotel in a distant town but visited his children every week end. *Fay v. John Waldron Corporation,* 117 N. J. L. 123, 187 A. 140. In that case the decedent's wife had died and the children were taken care of by the decedent's sister. The father kept his clothes and other belongings there. In *Morris v. Glen Alden Coal Co.,* 136 Pa. Super. 132, 7 A. 2d 126, recovery was not allowed where the parents had separated and the wife had custody of the children, although it was recognized that a mere temporary or enforced separation would not have been fatal to the claim.

In the instant case the decedent never established a household in South Carolina. When Hattie left Baltimore with the children in 1938, she went to live with her parents, and Rubin never saw them again. Her testimony that at the time of the hearing, September 7, 1945, she had rented a house of her own, does not fix the time when she acquired a separate establishment or that Rubin knew anything about it. To hold that this was in any sense his household would seem to be an unwarranted extension of the ordinary meaning of the word.

It is an undisputed fact that he had an establishment with another woman in Baltimore, and the statement that he intended to return to Gaffney is not persuasive. The Commission, who saw and heard the witnesses, evidently disbelieved this statement, indeed, in finding a total lack of dependency, they obviously disbelieved Hattie's uncorroborated statement that she received money from him within six months of his death. But even if we assume that he was supporting the children, we think he was not doing so in his household. To meet the statutory test, both requirements must be met.

*Judgment affirmed, with costs.*